**AMERICAN AIRLINES, INC., Plaintiff,**

v.

**A 1–800–A–M–E–R–I–C–A–N CORPORATION, Defendant.**

**No. 85 C 4499.**

United States District Court, N.D. Illinois, E.D.

Nov. 4, 1985.

Thomas Eaton, Peterson, Ross, Schloerb & Seidel, Chicago, Ill., for plaintiff.

William Stone, Bullaro & Carton, Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

This action by American Airlines, Inc. ("American") charges A 1–800–A–M–E–R–I–C–A–N Corporation ("1–800") with:

1. "false description [and] representation" and "false designation of origin" of 1–800's services in violation of Lanham Act § 43(a), 15 U.S.C. § 1125(a);

2. infringement of American's registered service marks in violation of Lanham Act § 32, 15 U.S.C. § 1114;

3. common law unfair competition by 1–800's acts of misrepresentation and palming off of its services as those of American, resulting in public confusion; and

4. pendent claims of deceptive trade practices pursuant to Illinois Uniform Deceptive Trade Practices Act § 2, Ill. Rev.Stat. ch. 121½, ¶ 312.

This Court has conducted an evidentiary hearing (holding six days of trial between May 24, 1985 and October 7, 1985) as to American's entitlement to a preliminary injunction. In the meantime a temporary restraining order ("TRO") originally issued by this Court May 8, 1985 has continued in effect by mutual agreement of the litigants.

In accordance with Fed.R.Civ.P. ("Rule") 52(a), this Court finds the facts specially as set forth in the following Findings of Fact ("Findings") and states the following Conclusions of Law ("Conclusions"). To the extent, if any, the Findings as stated reflect legal conclusions, they shall be deemed Conclusions; to the extent, if any, the Conclusions as stated reflect factual findings, they shall be deemed Findings.

### Findings of Fact

1. American is a Delaware corporation with its principal place of business in Dallas, Texas. It has engaged continuously in the business of marketing air transportation to the air traveling public for more than 50 years (since 1934). It serves 124 cities in the Western Hemisphere and Europe. In 1984 American had revenues of $4.5 billion, carried approximately 34 million passengers and spent approximately $60 million on media advertising alone.

2. American has long used its registered service marks (P. Ex. 1) in the promotion of its name and its business. Those service marks include the name "AMERICAN AIRLINES" and the logo of a circle around two capital letter "A"s, separated by the profile of an eagle, above the word "AMERICAN."

3. 1–800 is a Wisconsin corporation with its principal place of business in Aurora, Ontario, Canada. Greg Griswold ("Griswold") is 1–800's incorporator and sole stockholder. Griswold contrived 1–800's name and caused the company to be incorporated as a Wisconsin corporation on or about December 7, 1984 (1–800's Articles of Incorporation are D. Ex. 1).

4. In about March 1984 (well before the incorporation of 1–800) Griswold, representing another entity with whom he was affiliated (Ciphrex Corporation) requested and then attended a meeting with several representatives of American at its Dallas headquarters. Among those at the meeting was Dennis Crosby ("Crosby"), an executive having responsibility, among other things, for telemarketing and certain forms of promotion of American. At the meeting Griswold sought to explore his concept of marketing through the use of what he termed "ciphers" [1] (telephone numbers that corresponded to acronyms or names derived from the use of letters in conjunction with the numbers as displayed on an ordinary telephone dial). No agreement was reached at the meeting as to any business to be done between American and Griswold or any entity represented by Griswold. Instead Griswold was invited to submit a proposal in writing, which he admittedly declined to do, and he did not thereafter pursue the subject of that early meeting any further with any representative of American.

5. In October 1984 (more than six months after the meeting referred to in Finding 4, and at a time when Griswold had no ongoing contact with American at all) Griswold was advised by Bell Canada that he would be able to obtain for his use a toll-free 800 area code telephone number of 263–7422, which could be represented by the cipher "AMERICA." Because telephone technology accepts only the first seven digits after the area code (and thus any additional digit does not affect the tele-

phone number reached), anyone who dialed (or pushed buttons for) the cipher "AMERICAN" would also reach the telephone number 263–7422.

6. Due to technological considerations, the toll-free number referred to in Finding 5 was available only in the area of Aurora, Ontario. Accordingly Griswold arranged with Douglas Toombs ("Toombs"), the operator of an Aurora-area travel agency named Travelogue, to have a telephone installed in Travelogue's offices (a) to receive calls placed to that toll-free number and (b) to be answered by Travelogue's employees.

7. In about December 1984 Griswold made arrangements with the publisher of the Madison, Wisconsin yellow-pages telephone directory to have 1–800 listed in the next published edition of those yellow pages under the heading "Airline Companies."

8. Unlike American, neither Griswold nor 1–800 is a certificated air carrier. Neither Griswold nor 1–800 has ever owned or leased aircraft or has otherwise been involved in the business of airline transportation, as distinguished from the business of airline travel reservations. Neither Griswold nor 1–800 has any imminent plans, nor does either have the financial, business or other capacity, to do any of those things. Under the circumstances, any listing by 1–800 in the "Airline Companies" classification of the yellow pages (or elsewhere) has been and is materially false and misleading.

9. 1–800's listing in the Madison yellow pages was the beginning of a concentrated effort by Griswold to have 1–800 listed under the "Airline Companies" (or substantially identical) section of the yellow-pages telephone directories in the next published editions of those directories in most of the metropolitan areas in North America. Before the end of February 1985 Griswold had admittedly made arrangements to have such ads placed in every yellow-pages directory having a circulation of 60,000 copies or more, with 1–800 being the first

1. For convenience the remaining Findings and Conclusions will follow Griswold's usage of that term without quotation marks.

company listed under "Airline Companies." Those arrangements caused such listings to be scheduled in about *15 million* yellow-pages telephone directories in all major markets throughout the United States and Canada by the summer of 1985 (P. Ex. 10).

10. At no time did Griswold, or anyone else on behalf of 1–800, request permission from anyone at American to use the name A 1–800–A–M–E–R–I–C–A–N as that of an airline company in the yellow pages or elsewhere. Instead Griswold viewed 1–800 as a competitor of American.

11. By (a) contriving the name of his company to begin with the letter A, following by the digit 1 (required to telephone a toll-free 800 number) and then by the 800 area code telephone number, and then by (b) having that corporate name listed under the "Airline Companies" section of yellow-pages telephone directories, Griswold admittedly intended to have 1–800 listed first, or as close to first as possible, in the yellow pages under the "Airline Companies" heading. It is also significant that the corporate name and telephone directories listing chosen by Griswold is "A 1–800–A–M–E–R–I–C–A–N" rather than "1–800–A–M–E–R–I–C–A" (the true cipher corresponding to 1–800's telephone number). "AMERICAN" consists of eight letters, and accordingly the letter N, the eighth letter in that word, is superfluous to a seven-digit telephone number (see Finding 5). It is clear Griswold intended members of the public, seeing the listing in the "Airline Companies" section of the yellow pages, to associate 1–800's name with American, when Griswold very well knew there was no such affiliation.

12. There can be no doubt it was Griswold's intention to contrive and promote 1–800's name in a manner designed to confuse the public and to trade on American's goodwill and substantial business and advertising. Griswold gave interviews to the press, reported in early April 1985 (articles in the April 1, 1985 Travel Week Bulletin (P. Ex. 9) and in the April 13, 1985 Toronto Saturday Star (P. Ex. 8)), that candidly expose Griswold's intentions. Those arti-

cles disclose Griswold's intention to palm 1–800 off as American and thereby to divert American's business to 1–800. P. Ex. 9 quoted Griswold as saying "American Airlines is getting about 300,000 calls daily with about 30% of their business going that way and about 70% going through agents." It continued, "Griswold acknowledges many people will think they are dialing American Airlines when they phone his company." P. Ex. 8 refers to Griswold's having discovered "you don't have to be an airline to be listed in the yellow pages under airlines," and continues that by virtue of 1–800 being "listed at the top of the airlines listings in the yellow pages in every city above 75,000 population in North America ... Griswold expects to take away most of the 300,000 booking calls American Airlines agents get daily in the U.S." This Court rejects, as not credible, Griswold's denial of the accuracy of those articles, based as they were on reporters' interviews with Griswold. Both articles confirm that Griswold purposely intended (a) to imply an affiliation with American by virtue of the selection of 1–800's corporate name and (b) to trade upon calls intended for American by having 1–800 listed as near as possible to the top of the "Airline Companies" listings of the yellow pages. That intention is further confirmed by Griswold's own comments to American's Sabre customer service representative Barbara Katowski ("Katowski"), in which he advised Katowski of the name of his company and the fact people could call 1–800–AMERICAN for tickets. In response to her remark that "people will associate it with us," Griswold said, "Well, we're counting on that."

13. To serve the volume of business Griswold anticipated 1–800 would receive from the yellow-pages promotions, he needed both (a) sophisticated computerized travel reservation equipment and (b) a much larger number of computer terminals than would normally be required by an established travel agency (let alone a newly-formed one like his own). Griswold's very judgment that 1–800 would need 50 computer terminals right from the start reconfirms his intention and expectation that

1–800 would immediately divert American business to itself.

14. Griswold communicated with representatives of both Air Canada and United Airlines about the possibility of acquiring computerized facilities, but he ultimately decided the best computer equipment was American's Sabre equipment.[2] American's corporate division that sells and promotes the use of Sabre equipment is separate from American's divisions that have responsibility for either passenger sales or, in the context of this case, telemarketing. Field personnel in the respective divisions have responsibilities independent of those employed in other divisions.

15. Griswold's first contact with American as to the possibility of 1–800's purchase of Sabre equipment was his telephone conversation (which he tape recorded, D. Ex. 2) with Katowski on or about February 8, 1985. On February 12 Griswold met Sabre sales representative Michael Bielecki ("Bielecki"). At that meeting Bielecki and Griswold signed a "Letter of Intent" (D. Ex. 6), which contemplated American's future entry into a contract with 1–800 for the sale and installation of 50 Sabre computer sets. As part of the deal (customary in every Sabre sale), American was to provide Sabre training to a large number of representatives of 1–800.

16. Griswold himself attended Sabre training at American's headquarters in Dallas during the week of February 25, less than two weeks after his February 12 meeting with Bielecki. On March 1 and again on March 4, while in Dallas, Griswold telephoned and spoke with Rick Nelson ("Nelson"), the head of American's American Eagle program, under which American franchises the "American Eagle" name to certificated regional or commuter airlines.

After their very brief March 1 conversation, Griswold caused to be delivered to Nelson a copy of the proposed 1–800 yellow pages listing for the Fort Myers, Florida yellow-pages telephone directory, with Griswold's handwritten note containing the information referred to in Finding 9 (Ex. 10). Before the March 4 telephone conversation, Nelson made a test call to the 1–800–A–M–E–R–I–C–A–N telephone number, posing as a potential customer, to determine the nature of 1–800's business. Nelson asked for 1–800's address, but the individual to whom he spoke (a representative of 1–800 in Aurora, Ontario) refused to furnish one. Then during the March 4 telephone conversation with Griswold, Nelson said he believed the business of 1–800 to be nothing but a travel agency. Griswold denied that and attempted to describe the planned business activities of 1–800 in some detail. Nelson responded he did not see any way the American Eagle program could be of assistance to Griswold, and Griswold would have to speak with someone else at American for any assistance. But Nelson also told Griswold he was concerned with what 1–800 was doing and he would be watching closely to see that 1–800 would not act as if it were American Airlines. Accordingly Griswold and 1–800 were on specific notice not later than March 4 as to (a) American's concern with what 1–800 was doing and (b) American's intent to protect its rights against 1–800. At that time (if not earlier) 1–800's actions vis-a-vis American were at 1–800's peril.

17. 1–800 urges, by way of defense, American somehow acquiesced in the conduct of 1–800, by virtue of Griswold's disclosure to employees of American of his "marketing plan."[3] That argument is wholly unpersuasive. Griswold did not speak with any potentially responsible

---

**2.** Like the other types of computerized equipment, Sabre equipment is of course not limited to the marketing of a single airline company's transportation services. Sabre delivers information as to, and is used to make reservations on, all airlines (not just American). Indeed its sophistication and its facilities involve a network extending far beyond air transportation services.

**3.** That term is how Griswold described the adoption of the 1–800–A–M–E–R–I–C–A–N corporate name, coupled with listing that name in the "Airline Companies" section of the yellow pages.

American representative until his March 1 and March 4, 1985 conversations with Nelson. But Griswold's approach to Crosby nearly a year earlier demonstrates Griswold's prior understanding and recognition he had to deal with American's headquarters if he wanted to obtain its approval or cooperation in any joint effort. Griswold did not follow up at that earlier date, and when he spoke to Nelson in March 1985 he was put on notice in no uncertain terms neither he nor 1–800 had any acquiescence from American. And of course Griswold at all times knew there was no such acquiescence.

18. Unable to find comfort in Griswold's telephone conversations with Nelson, 1–800 points to Griswold's February 8 discussion with Katowski and his February 12 discussion with Bielecki. Neither discussion can carry the baggage 1–800 seeks to load on it:

(a) In his February 8 telephone conversation with Katowski, Griswold disclosed the name of his company only after eliciting a pledge of secrecy from Katowski, asking her "to not hear it or keep it very private to yourself." Griswold's obvious concern lest Katowski disclose what he was telling her to any of her superiors or to anyone in any position of authority within the structure of American both (1) negates any notion of American's acquiescence in 1–800's conduct and (2) again confirms Griswold's guilty awareness of the infringement of American's rights inherent in that conduct. As to the former issue, although Griswold hinted to Katowski as to the location of 1–800's listing in the yellow pages, he did not expressly tell her it would be listed under the "Airline Companies" section.

(b) Bielecki clearly thought of 1–800 as a travel agency (albeit one with grandiose plans). In the February 12 telephone conversation, Toombs, whom Bielecki knew to be a travel agent, participated with Griswold and Bielecki. In his February 25 letter (P. Ex. 7) extending congratulations on 1–800's acquisition of a Sabre automation system, Bielecki said he wanted to "welcome you to the travel agency elite." Nothing in his conduct evidenced any understanding Griswold and 1–800 were operating as an airline company. In fact all the activities of 1–800, as described in Griswold's testimony, were not really different from those of an ordinary travel agency. They certainly did *not* constitute the business of an airline company.

19. Even apart from the matters stated in Finding 18, both Katowski and Bielecki were essentially enthusiastic sales personnel in relatively low-level positions with American, exercising their maximum efforts to sell their product as sales personnel usually do. Neither was a person who could be expected to understand the significance of what is necessarily involved in the preservation of service marks. Neither was an attorney or in any way responsible for the marketing or franchising of American's service marks. Information imparted to either or both of them by Griswold cannot be ascribed to American so as to create any implied acquiescence in 1–800's "marketing plan." Moreover, there is no realistic doubt Griswold fully understood all the limitations expressed in this Finding.

20. 1–800's right to purchase or acquire Sabre equipment, or to operate Sabre systems in connection with a travel agency business, is not at issue in this action.[4] What is at issue is 1–800's claimed right to advertise in the yellow pages as an "airline company" (when it is not one), when in the process it infringes American's service marks and it deceives and misleads the public into believing, through its false advertising, 1–800 has some connection or affiliation with American (when in fact it

---

4. It should be emphasized American had and has no objection to 1–800's use of its name or telephone number for the conduct of a travel agency business as such, or to 1–800's use of American-supplied Sabre equipment for that purpose. Rather the problem is posed by 1–

800's false and misleading yellow-pages listing as an "airline company," so that members of the public seeking to call American for purposes of purchasing its air transportation services would instead reach 1–800, which could then divert the business to other airlines.

admittedly does not). Again 1–800 surely is not and was not an "airline company," despite Griswold's contentions to the contrary. 1–800 possessed no airplanes and had no commitment for its use of airplanes. It had no other indicia of being an airline. At most Griswold had an ill-formulated notion 1–800 might become some kind of airline at some time in the future in some undefined way. But 1–800's yellow-pages advertising exists now and promises a service 1–800 cannot deliver. That is false advertising and constitutes unfair competition with American. Griswold concedes what common sense tells us: Members of the public seeing 1–800's advertisement in the yellow pages under "Airline Companies" would assume they were communicating with American. That in fact happened. Griswold expected it and counted on it. That amounted to palming off and unfair competition.

21. On or about March 12 (after his telephone conversations with Nelson) Griswold entered into (a) a lease agreement for 1–800 covering the premises at 225 Industrial Parkway, Aurora, Ontario (D. Ex. 12) and (b) an agreement with Bell Canada to provide 1–800 with sophisticated PBX telephone equipment (D. Ex. 13). Thereafter Griswold continued to add to 1–800's obligations to both the lessor (see, e.g., the May 6, 1985 lease addendum to the lease (P. Ex. 17)) and Bell Canada into the month of May 1985, up to the time that Griswold was served with the Complaint and original TRO in this case. Griswold also continued during that period to expand the listings of 1–800 in yellow-pages telephone directories throughout the United States.

22. Immediately after the March 4 Griswold-Nelson telephone conversation, Nelson brought the matter to the attention of David Schwarte ("Schwarte"), a member of American's in-house counsel staff. Schwarte had previously (and wholly independently) been engaged in a recent exchange of correspondence initiated by Madison Travel (a travel agency in Madison, Wisconsin) as to the possibility of that travel agency's doing business with 1–800. Schwarte had responded to Madison Travel that American would not object to its doing business with 1–800 unless that entity was engaged in the sale of air transportation or other travel-related services, or both. However, Schwarte had deferred any definitive response to Madison Travel pending his receipt of more explicit information as to the nature of the business of 1–800, as well as other internal advice from American representatives. When he then received Nelson's information about his telephone conversation with Griswold, Schwarte pursued a number of avenues to attempt to locate an address for 1–800, but initially those efforts were not successful. For example, Schwarte called the 1–800 telephone number, but the representative of 1–800 he spoke to refused to provide him with an address. On March 6 Schwarte wrote to Madison Travel (P. Ex. 12) that American believed 1–800's conduct, as American understood it, would cause air travelers to believe they were dealing with American or an organization affiliated with American, and that American intended to protect its rights vigorously against the resulting consumer confusion. Schwarte testified credibly he would have provided 1–800 with a copy of that letter but for his inability to locate an address for 1–800.

23. Indeed as of March 6, 1985 1–800 apparently had no viable address. On the Letter of Intent Griswold and Bielecki had signed February 12 (D. Ex. 6),[5] Griswold listed 1–800's address as 45 Grist Mill, Holland Landing, Ontario. At the hearing Griswold testified that address was one neither he nor 1–800 had ever occupied, and he could not testify that mail to that address was ever received, or would have been received, by 1–800. It was not until at least March 12, 1985 that Griswold

5. There was no reasonable way Schwarte could then have had knowledge of that Letter of Intent, a single transaction in a wholly different division of American's very large organization. Testimony during the hearings confirmed the normal transmittal of documents within American's organization understandably did not call for copying Schwarte (or anyone else not in the direct line of organization dealing with Sabre equipment) with such Letters of Intent.

signed the lease for the premises at 225 Industrial Parkway, Aurora, Ontario, and not until some time thereafter that 1–800 was able to occupy those premises.

24. In late March 1985 Schwarte did receive an address for 1–800 from Ed Thomas ("Thomas"), American's Manager of Passenger Sales for Canada. Schwarte immediately had Thomas send a March 29 letter to Griswold (P. Ex. 5):

(a) confirming American would activate 1–800's access to the Sabre reservation system as soon as it received verification of 1–800's having received approval from the Ontario government to operate as a travel agent, but

(b) expressing American's concern that 1–800 was operating its telephone reservation service in a manner that posed a danger of misleading callers into believing 1–800 had some association with American and

(c) specifically advising Griswold that activation of his access to Sabre should not be viewed as any approval from American for potential infringement on American's trade name, but rather that American intended to monitor the situation closely and to take any action necessary to protect its interests.

25. Griswold made no written response to the March 29 letter. In the meantime Schwarte had been awaiting receipt of yellow-pages advertisements to confirm that 1–800 had in fact been listed under the "Airline Companies" section of the yellow pages. But when he then received copies of the early April newspaper interviews with Griswold referred to in Finding 12, Schwarte promptly decided to send 1–800 a written demand. Schwarte's April 8 letter (P. Ex. 6):

(a) advised Griswold and 1–800 that American viewed the conduct of 1–800 to be misleading and confusing to the public, in that American believed travelers would be led to believe American had some participation in, or otherwise endorsed, 1–800's activity;

(b) stated American's belief that 1–800 was unlawfully trading on American's

goodwill and infringing on American's registered marks;

(c) insisted upon a written commitment from 1–800 that it would cease using the name "American" in connection with its conduct of an airline reservation service;

(d) requested a commitment to cooperate in a telephone intercept to advise callers of the correct number of American; and

(e) threatened litigation in the event no response was forthcoming.

Griswold admittedly received that letter and made no written response.

26. Between his receipt of the March 29 letter from Thomas and his receipt of the April 8 letter from Schwarte, on or about April 1 Griswold called and spoke with Guy Mitchell ("Mitchell"), American's Division Manager for Passenger Sales in Chicago, Illinois. Griswold's purported purpose in calling was to complain about American's slow response in having his Sabre equipment delivered, installed and made operational. During the course of that conversation, Mitchell advised Griswold American was troubled with the corporate name of 1–800 and its marketing activities. Mitchell asked Griswold if, in light of those circumstances, 1–800 still wished to proceed with the installation and commencement of operation of the Sabre system it was having installed. Griswold rejected any option to be relieved of that responsibility, and in fact insisted American activate his Sabre connections as rapidly as possible. American believed it was contractually obligated to proceed with 1–800's Sabre installation if 1–800 so chose, fearing legal vulnerability should American then fail to deliver. American thus gave 1–800 an option to get out, but Griswold declined. American proceeded to activate 1–800's Sabre system on or about April 12. Nothing in any of that conduct evidenced any waiver by American of its right to enforce its marks.

27. When Griswold failed to respond to Schwarte's April 8 letter, the matter was turned over to outside counsel for handling. On May 8 American filed this action.

*Conclusions of Law*

1. This Court has federal-question and diversity-of-citizenship jurisdiction over this action under 15 U.S.C. § 1125(a) and 28 U.S.C. § 1331, respectively. It also has pendent jurisdiction over American's state law claims in Complaint Counts IV and V, asserted respectively under the Illinois Uniform Deceptive Trade Practices Act and the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat. ch. 121½, ¶¶ 311–317 and 261–272.

2. At issue at this point in these proceedings is the propriety of issuance of a preliminary injunction to prohibit 1–800's infringement of American's service marks, to enjoin violations by 1–800 of Lanham Act § 43(a), 15 U.S.C. § 1125(a), to enjoin common-law unfair competition by 1–800 and to enjoin 1–800's deceptive trade practices as prohibited by the applicable Illinois statutes.

3. Before *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380 (7th Cir.1984), our Court of Appeals' most common articulation of standards for preliminary injunctive relief required the plaintiff to bear the burden of proof on each of four factors. Thus, for example, *Wesley-Jessen Division of Schering Corp. v. Bausch & Lomb Inc.,* 698 F.2d 862, 864 (7th Cir.1983) (a trademark case) stated the factors this way:

> 1. whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue;
>
> 2. whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant;
>
> 3. whether the plaintiff has at least a reasonable likelihood of success on the merits; and
>
> 4. whether the granting of a preliminary injunction will disserve the public interest.

Several post-*Roland* cases have reverted to the same four-factor formulations (see, e.g., *Palmer v. City of Chicago,* 755 F.2d 560, 576 (7th Cir.1985), using the disjunctive in the first factor and yet surprisingly citing *Roland* as an authority for the "well-settled" four-factor test). These Conclusions will deal with the required showing in both *Roland's* terms and by application of the four-factor test.

4. Among the principal refinements and clarifications *Roland* has added to the earlier (and perhaps later) conventional statements of standards are:

> (a) Plaintiff must show both the lack of an adequate remedy at law *and* irreparability of harm (*Roland,* 749 F.2d at 386). Some earlier cases, and even some later ones (see, e.g., *Palmer*), could be read as requiring only one of those two showings.
>
> (b) Plaintiff's required showing of probability of success on the merits varies with the quality and quantum of harm plaintiff will suffer from the denial of the injunction. That calls for a "sliding scale" evaluation of the likelihood of success and the relative harm to the parties. To the extent plaintiff's showing on one of those factors is stronger, a lesser degree of showing is required on the other (*Roland,* 749 F.2d at 387–88).

5. American's lack of an adequate remedy at law (as defined by Fiss & Rendleman, *Injunctions* 59 (2d ed. 1984), cited by *Roland,* 749 F.2d at 386) is self-demonstrative. Trademark or service mark ownership—the public's continued identification of the product or service bearing the mark with the owner of the mark—is a meaningless right unless the infringer can be enjoined. Damages cannot supplant the mark owner's right to its exclusive use. That is really what the trademark cases mean when they say (*Processed Plastic Co. v. Warner Communications, Inc.,* 675 F.2d 852, 858 (7th Cir.1982) ):

> This and many other Courts have often recognized that the damages occasioned by trademark infringement are by their very nature irreparable and not susceptible of adequate measurement for remedy at law.

Here the nature of the loss incurred by American from 1–800's conduct would be very difficult to calculate (see Conclusion 6), and damages due to 1–800's unlawful interference with American's name and service marks also pose difficulties of calculation. Injunctive relief will obviate those problems.

6. American's irreparable harm is also beyond question. It cannot be said of American that (*Roland*, 749 F.2d at 386):

[A]lthough the ultimate relief that the plaintiff is seeking is equitable, implying that [it] has no adequate remedy at law, [it] can easily wait til the end of trial to get that relief.

As stated in *Hyatt Corp. v. Hyatt Legal Services*, 736 F.2d 1153, 1158 (7th Cir.1984) (citations omitted, brackets in original, and quoting this Court's opinion in *Instrumentalist Co. v. Marine Corps League*, 509 F.Supp. 323, 333 (N.D.Ill.1981), *aff'd*, 694 F.2d 145 (7th Cir.1982)):

We note that it is the very nature of dilution to gnaw away insidiously at the value of a mark.... Such an injury would be remarkably difficult to convert into damages. "[T]here is no effective way to measure the loss of sales or potential growth—to ascertain the people who don't knock on the door or to identify the specific persons who do not [return] because of the existence of the infringer."

7. In the terms made relevant under Conclusion 6, American's having to await the final judgment after trial before obtaining relief would plainly create an irreparably confused and damaging situation. Griswold admitted 1–800 expected to handle 300,000 calls a day—calls Griswold expected to take away from American. He confirmed a lot of people would think they were dialing American, but that upon reaching him they would discover that he was in a position to deliver different kinds

of bargains, and they would stay with him. Absent injunctive relief, the irreparability of harm to American from that set of facts is plainly demonstrated. There is the related consideration (albeit somewhat speculative) identified in *Roland:* If 1–800 were *not* successful financially even though it caused damage to American,[6] it could well be economically impossible for 1–800 to bear the damages American showed at the end of trial, thus producing either a wholly empty judgment or one difficult of collection.

8. Balancing of harms involves the comparison of American's irreparable harm from the wrongful denial of a preliminary injunction with (*Roland*, 749 F.2d at 387):

any irreparable harm that the defendant might suffer from the injunction—harm that would not be either cured by the defendant's ultimately prevailing in the trial on the merits or fully compensated by the injunction bond that Rule 65(c) of the Federal Rules of Civil Procedure requires the district court to make the plaintiff post.

Because 1–800's wrongful conduct lies in its misleading use of the "Airline Companies" yellow-pages listing rather than its mere use of its telephone number (or its mere sale of airline tickets) as such, it is difficult to conceive of its prevailing on the merits in the classical sense. Instead this Court has sought unsuccessfully (before entry of the TRO and during its pendency) to prevail on 1–800 to devise a means for its continued use of its telephone number (thus enabling it to continue to contract with other companies that sell goods or services other than airline transportation— companies to whom use of the telephone cipher AMERICA or AMERICAN would have a value from which 1–800 might legitimately derive financial benefit), without American's being subjected to the contin-

6. Griswold's odd combination of naivete and cupidity, evident in his testimony at the hearing, does not inspire confidence in his business acumen. There is no assurance 1–800's business, even if successful in siphoning off substantial telephone-call volume from American, could sustain the financial commitments Griswold's grandiose plans had created (or the even greater financial commitments Griswold, with his pie-in-the-sky approach, was likely to create if his initial efforts met with some success).

ued risks of (a) losing business from persons who believe they are calling it when they call 1–800's number and (b) suffering other damages to its mark and its goodwill from 1–800's conduct over which it has no quality control. 1–800 has not devised such a means, and its telephone number has therefore been out of service during the TRO's pendency. 1–800's potential damages in that respect should certainly be capable of elimination or at least minimization, but even were that not so, in any case 1–800 has not quantified such potential damages. As for 1–800's harm that it would have suffered in the unlikely event it were to succeed on the ultimate merits, that too has really not been quantified, and much of that possible harm has been created by 1–800's proceeding at its own peril with full knowledge of American's claims and rights.

9. In the balancing-of-harms process in this case, the most significant factor is the fact that the probability of 1–800's success on the merits is so low on the "sliding scale" referred to in *Roland* as to render any question of irreparable harm to 1–800 a minimal consideration in the issuance of this preliminary injunction. *Roland* teaches the greater the likelihood of success on the merits a plaintiff demonstrates, the less necessary it is for plaintiff to demonstrate the balance-of-harm scales tip in its favor (while conversely a plaintiff showing a very slight likelihood of success on the merits would have to show an extremely strong balance of relative harms in its favor to obtain preliminary injunctive relief). Here both the "sliding scale" factors strongly favor American. Its likelihood of success on the merits is extremely high, if not a virtual certainty (a matter dealt with in greater detail in the following Conclusions). American's registration of its marks, here infringed by 1–800, is prima facie evidence of American's exclusive right to use that mark, and that fact alone would make American "likely to succeed on the merits" in enforcing its marks (*Instrumentalist*, 509 F.Supp. at 328). And the balance of harms also leans heavily in American's favor. Such a multiplication of slight odds

(that is, the odds favoring 1–800) militates very strongly in favor of issuance of the preliminary injunction.

10. On the issue of service mark infringement, American has established registration of its service marks and has further clearly established a secondary meaning in the name "American" (without that name being conjoined with the word "Airlines") in the field of delivery of air transportation services. As *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, 380 (7th Cir.1976) put it, the relevant factors on the issue of secondary meaning are the "amount and manner of advertising, volume of sales, the length and manner of use, direct consumer testimony and consumer surveys." Although in this case there are no consumer surveys, it has been clearly established (see Finding 1) American has a tremendous volume of sales and expends millions of dollars annually in advertising its name in that context. American has used its registered service marks and promoted its name in the airline transportation industry, in a very high-profile manner, for over 50 consecutive years.

11. Interestingly (and significantly) enough, Griswold himself, in the course of his testimony in this case, confirmed the strength of American's acquired secondary meaning by his own use (on several occasions) of the word "American"—without adding "Airlines"—when he meant to refer to plaintiff. Moreover, the facts of this case bring it within the well-established doctrine exemplified by the holding in *Parrot Jungle, Inc. v. Parrot Jungle, Inc.*, 512 F.Supp. 266, 269 (S.D.N.Y.1981), that factors to be considered in determining secondary meaning include—in addition to the duration of American's exclusive use of its mark, the nature and extent of its advertising and promotion of the mark, the extent to which its business has come to the attention of the consuming public, and its patronage record—1–800's "conscious copying of plaintiff's mark." Here Griswold, on behalf of 1–800, consciously and deliberately copied American's service mark in an effort to take advantage of American's

goodwill and reputation. Indeed, the reason Griswold believed he needed to get 50 computers on line immediately was because he anticipated public confusion associating 1–800 (as listed in millions of yellow-pages telephone directories) with American. Griswold expected 1–800 would immediately begin receiving the benefit of a substantial block of American's great volume of daily calls seeking airline transportation reservations. Even without the factors identified in Conclusion 10, 1–800's "conscious copying" gives strong confirmation of American's establishment of a secondary meaning in the name "American" alone (without the word "Airlines") in the field of delivery of air transportation services. Indeed, though Griswold's testimony disingenuously sought to make much of the fact several other airlines have the word "America" as part of their names (thus seeking to suggest 1–800 was just one of the crowd), that testimony glosses over the significant facts that:

   (a) Griswold chose "A–M–E–R–I–C–A–N" rather than "A–M–E–R–I–C–A," even though the latter was the *true* cipher for 1–800's telephone number.

   (b) By listing 1–800 under *"Airline* Companies," Griswold *did* directly conjoin "American" (his company listing) with "Airline" (the classification).

That purposeful encroachment on American's rights underscores the otherwise-demonstrated secondary meaning American has acquired in its field.

12. *Roland* (like earlier case law) identifies the implication of the public interest as a consideration in the issuance of preliminary injunctions. But *Roland*, 747 F.2d at 388 makes plain (as earlier case law seldom articulated) the public interest factor is to be judged by the extent to which the order granting or denying the preliminary injunction "will have consequences beyond the immediate parties." Trademark and service mark cases epitomize the situations in which the public interest in that sense is a paramount consideration. As the evidence shows, Griswold and 1–800 were counting on creating confusion in the minds of the consuming public, the public that consumes airline transportation services, as the very means of promoting 1–800's business. It is almost tautological to say the public weal is seriously affected by the kind of misleading advertising and efforts to poach on American's preserves reflected by the evidence of 1–800's conduct in this case.

■ 13. Likelihood of confusion is a critical factor not only on the issue of infringement but also as to the propriety of granting relief. As our Court of Appeals said in *James Burrough Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266, 274 (7th Cir. 1976) (citations omitted, but quotation adapted to this case):

   As has been said, "people do not confuse trademarks—trademarks confuse people."

   \*   \*   \*   \*   \*   \*

A "trademark" is not that which is infringed. What is infringed is the right of the public to be free of confusion and the synonymous right of a trademark owner to control his product's reputation. Thus [American's] evidence must be evaluated on the basis of whether it disclosed a likelihood that consumers generally familiar with [American's] marks would be likely, upon seeing only [1–800's yellow-pages advertising], to believe that [1–800's] enterprise was in some way related to, or connected or affiliated with, or sponsored by, [American]. If so, a right to relief for trademark infringement has been shown.

That test has surely been met. Griswold conceded that he expected and was counting on that kind of public perception. Though *actual* confusion (as contrasted with its likelihood) need not be shown, 1–800's own survey records maintained by its employees (P. Ex. 14), covering the period between May 8 and May 10, 1985, reflected frequent actual confusion between 1–800 and American on the part of callers who had obtained the 1–800 number from the "Airline Companies" yellow-pages listings. Likelihood of confusion (and the consequent likely dilution of the value of American's marks) is readily apparent.

14. 1–800 contends American, through its conduct, in some manner acquiesced in 1–800's infringement of its marks or was otherwise guilty of laches or undue delay in enforcing those marks. Each of those defenses is unpersuasive, as the following Conclusions reflect.

15. As for any claimed acquiescence by American, Griswold never sought American's approval for 1–800's use of American's marks. To the extent Griswold disclosed his plans, he did so only to low-level American computer sales and technical employees, and only then in a roundabout and unclear manner (adverting to a "marketing plan" that Griswold himself maintained was unique, complex and difficult to comprehend fully). Though Griswold's own earlier conduct showed he plainly knew how to submit proposals to persons in positions of authority, he did not disclose his full intentions to any such person until his March 1, 1985 telephone call to Nelson. It is worth noting that call was made less than three weeks after Griswold's first approach to anyone at American on this subject (his February 8 call to Katowski). American moved as rapidly as was reasonably to be expected of a large corporation with fragmented information.[7] Thomas' March 29 letter to Griswold (P. Ex. 5; see Finding 24) clearly enunciated American's concerns. That letter was followed by other contacts (including Schwarte's April 8 letter, P. Ex. 6) seeking to have 1–800 cease its misconduct. None of this reflects any undue delay on the part of American, nor does it reflect any acquiescence by American in 1–800's infringement of American's marks. There is no reasonable doubt that, had American possessed full information sooner, it would have acted sooner in precisely the same way in which it did act. No credence is to be given to any suggestion that American somehow misled 1–800 into acting to its own detriment before American instituted this action to vindicate its lawful rights.

15. Nor is there any predicate for a laches defense here. Even had American delayed in pursuing its rights (as it did not), mere delay is not sufficient to bar a lawsuit such as this one (*Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 615 (7th Cir.1965)), especially where (as here) the infringer has had knowledge of its own infringement and has deliberately set out to capitalize on the goodwill of the owner of the marks. *Holiday Inns, Inc. v. Holiday Inn*, 364 F.Supp. 775, 783–84 (D.S.C. 1973), *aff'd mem.*, 498 F.2d 1397 (4th Cir. 1974). To invoke the laches doctrine, a defendant must prove both inexcusable delay and resulting prejudice. *Advanced Hydraulics, Inc. v. Otis Elevator Co.*, 525 F.2d 477, 479 (7th Cir.), *cert. denied*, 423 U.S. 869, 96 S.Ct. 132, 46 L.Ed.2d 99 (1975). In the trademark context, our Court of Appeals has said (*Tisch*, 350 F.2d at 615) plaintiff's delay must be "so prolonged and inexcusable that it amounts to a virtual abandonment of the right by the plaintiff for a long period of time. . . ." 1–800 fails utterly on both branches of the laches test. There was no "delay" by American in filing this action, much less any "inexcusable delay."[8] As soon as American's corporate headquarters obtained an address to which an objection could be sent, one was dispatched. Another follow-up letter was sent promptly thereafter, demanding a cessation of 1–800's infringing activities. Having received no response to any of the correspondence, American promptly filed this suit May 8, 1985. And particularly given American's then-expressed willingness to relieve 1–800 of its obligations to buy the Sabre installations (see Finding 26), no credible

---

**7.** American was also handicapped by the facts that (1) no address could be located for 1–800 in the first instance, (2) the persons at 1–800 who received Nelson's March 1 telephone call refused to disclose such an address and (3) there was no genuine mailing address available for 1–800 until some time after March 12.

**8.** Any brief delays in reaching Griswold during March 1985 were excusable under all the circumstances, and they created no material prejudice in any case. 1–800 was bent on its course of conduct, and Griswold's activities show a total unwillingness to be deterred from that course.

evidence of prejudice from the minimal "delay" has been shown.

■ 16. All the foregoing Conclusions confirm American's having met its burden as to all of the prerequisites for preliminary injunctive relief. It is, however, worth recapitulating the aspects of the substantive merits of the dispute as to which American has shown far more than a reasonable likelihood of success:

(a) 1–800's use of words and symbols (its telephone number) in the yellow pages' "Airline Companies" listing tend falsely to describe or represent its services by falsely connoting to the public an affiliation of 1–800 with American. Inasmuch as the services clearly have been introduced into interstate commerce, 1–800 has violated Lanham Act § 43(a), 15 U.S.C. § 1125(a).

(b) That same conduct has infringed American's registered service marks and constitutes common-law unfair competition.

(c) 1–800 has also committed deceptive trade practices violative of Illinois Uniform Deceptive Trade Practices Act § 2, Ill.Rev.Stat. ch. 121½, ¶ 312, by:

(1) passing off its services as those of American;

(2) causing the likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of its services;

(3) causing the likelihood of confusion or misunderstanding as to its affiliation, connection or association with or certification by American; and

(4) representing 1–800's services have the sponsorship, approval, characteristics, ingredients, uses, benefits or quantities they do not have, or 1–800 has a sponsorship, approval, status, affiliation or connection it does not have.

Accordingly, through the exercise of this Court's pendent jurisdiction, American is entitled to injunctive relief pursuant to Illinois Uniform Deceptive Trade Practices Act § 3, Ill.Rev.Stat. ch. 121½, ¶ 313.

\* \* \*

Based on the foregoing Findings and Conclusions and in accordance with Rule 65(d), this Court hereby orders that pending a hearing on the ultimate merits of this litigation A 1–800–A–M–E–R–I–C–A–N Corporation ("1–800"), together with its officers, agents, employees, attorneys and all other persons in active concert or participation with 1–800 or any of the aforesaid persons, are enjoined and restrained:

(1) from using the trade name or trade designation "A–M–E–R–I–C–A–N," "A 1–800–A–M–E–R–I–C–A–N" or "AMERICAN" or any confusingly similar name in the solicitation of customers, in the promotion or advertising of 1–800's business or otherwise, all in the field of delivery of air transportation services or air transportation reservation services;

(2) without thereby limiting the generality of subparagraph 1 of this order, from taking any further action to cause 1–800 or any other trade name or trade designation referred to in subparagraph 1 to be listed under the "Airline Companies" (or substantially similar) section of any yellow-pages telephone directory; and

(3) from continuing in any use of the telephone number "1–800–263–7422" (1–800–A–M–E–R–I–C–A(–N)");

all so long as any yellow-pages telephone directories in which 1–800 is listed with that telephone number under the "Airline Companies" (or substantially identical) section continue to be in active circulation anywhere in the United States and Canada. This preliminary injunction will remain in effect until further order of this Court.

American Airlines has previously posted a $10,000 bond as security for the TRO. In accordance with Rule 65(c) this Court has considered the costs and damages that "may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Because the conduct that has triggered this preliminary injunction is 1–800's unquestionably (and intentionally) misleading listing of itself among "Airline Companies" in millions of yellow-pages telephone directories (and not 1–

800's mere adoption and use of its name for the provision of travel agent services), and because this preliminary injunction makes plain that but for such intentionally misleading listing 1–800 would be free to use its name and telephone number for all legitimate purposes, and because 1–800's arrangements for those telephone directory listings were begun with knowledge of their misleading nature and without 1–800's having incurred any other financial obligations (including obligations to American for Sabre equipment) and were continued even after American notified 1–800 of its objections, any potential costs and damages from any restraint that could conceivably be found to be wrongful have not been shown by 1–800 to be material in nature or amount. Accordingly the $10,000 TRO bond is hereby converted to a preliminary injunction bond and approved for that purpose with no further change in form or amount.