225 F.3d 1030 (9th Cir. 2000)
 MARY J. KLING, an individual, Plaintiff-counter-defendant-Appellant,
v.
HALLMARK CARDS INC., a Missouri corporation; MATTEL, INC., a Delaware corporation, Defendants-Appellees,
DIC ANIMATION CITY INC., f/k/a/ Live Film and Mediaworks, Inc., Defendant-cross-defendant-Appellee,
UNITED FEATURE SYNDICATE INC., Defendant-counter-claimant-cross-claimant-Appellee.
 No. 99-55222
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted June 9, 2000--Pasadena, California
 Filed September 6, 2000
 
 COUNSEL: Michael H. Bierman, Tuttle & Taylor, Los Angeles, California, for the plaintiff-appellant.
 Adrian Mary Pruetz, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, California, for the defendantsappellees.
 Appeal from the United States District Court for the Central District of California Edward Rafeedie, District Judge, Presiding D.C. No. CV-97-06293-ER-JGx
 Before: Stephen Reinhardt, Richard A. Paez, Circuit Judges, and William L. Dwyer, District Judge.[1]
 OPINION
 REINHARDT, Circuit Judge:
 
 
 1
 Rainbow Brite is a young girl who, with the help of the Color Kids, her magical horse Starlite, and the small furry sprites who mine for sprinkles in the Color Caves, strives to keep color alive in Rainbow Land. Robotman, Stellar, Oops, and Lint are robots from Robot Land who, for some reason, enjoy helping human teenagers play music. Here in Legal Land, a rather joyless dispute has arisen regarding the ownership of the copyrights in the scripts for six animated children's television specials featuring the Rainbow Brite and Robotman characters. The specials were written by Woody Kling and produced and broadcast in the mid-1980s. Proceeding on the assumption that Mary Kling, Woody Kling's widow and successor in interest, owns these copyrights, we are asked to decide whether the doctrine of laches bars her from filing in 1997 a claim for infringement based on infringing conduct that began in 1985 but may not have come to either of the Klings' attention prior to 1994. The district court granted the defendants summary judgment, holding that Woody Kling's failure to sue for a declaration of ownership within a reasonable time following July 17, 1985, when he learned that one of the defendants claimed to own the copyrights, barred his widow's 1997 infringement claim.
 
 
 2
 We hold that the period of delay for laches for a copyright infringement claim runs only from the time that the plaintiff knew or should have known about an actual or impending infringement, not an adverse claim of ownership. Because there is, at the very least, a genuine issue of material fact as to whether the Klings knew or had reason to know about an actual or impending infringement of their alleged copyrights prior to August 1994, we reverse the grant of summary judgment and remand for further proceedings.
 
 I. Background
 A. Woody Kling's Scripts
 
 3
 Beginning in 1981, Hallmark Cards, Inc. ("Hallmark") began to develop the Rainbow Brite character and a number of related characters and story lines. In August 1983 Hallmark began discussions with DIC Enterprises, Inc. ("DIC") regarding the development of an animated children's television program based on the Rainbow Brite characters. In December 1983 the two companies agreed that DIC would produce a Rainbow Brite program and that DIC would assign to Hallmark the copyrights in all material created by or for DIC. United Feature Syndicate, Inc. ("United Feature") also engaged DIC to produce an animated children's television program based on the character of Robotman.
 
 
 4
 Heywood F. "Woody" Kling was a producer and headwriter on numerous television shows. In 1974 he incorporated Heywood Kling Productions, Inc. ("HKP") and as its sole employee wrote scripts for various television programs and plays. Through HKP, Kling contracted with television production companies, networks, and individual producers on a project-by-project basis.
 
 
 5
 In 1983 and 1984, Kling entered into three contracts with DIC to write scripts for three Rainbow Brite and three Robotman television specials. Each contract provided as follows:
 
 
 6
 1. DIC engaged Kling to write "a story premise, outline, teleplay and appropriate polish(es)" for the respective programs.
 
 
 7
 2. Kling would be paid $20,000 for each special in three installments.
 
 
 8
 3. Kling would receive separate card credit (as writer for the first contract, and writer and developer for the second two contracts).
 
 
 9
 4. "Any feature adaptations, network series, or network special must be renegotiated in good faith. The aforesaid terms represent syndication broadcast only."
 
 
 10
 5. If more than three episodes containing characters developed by Kling were televised, he would receive $1000 per episode royalty.
 
 
 11
 Kling wrote the scripts. From 1984 to 1986, Hallmark registered a series of copyrights in various works relating to the Rainbow Brite characters, including the three television specials that Kling had written. The certificates of registration for these copyrights identified DIC as the author and stated that DIC had assigned Hallmark the copyright through their December 1983 contract. Also in the mid-1980s, DIC transferred its rights in the Robotman specials to United Feature, which then registered copyrights in the specials as their purported sole owner.
 
 B. The Credit Dispute
 
 12
 Beginning in 1984, a dispute arose between Kling and DIC regarding card credit. Kling believed that he was due "Developed by" credit in episodes of Rainbow Brite and Robotman that, although not written by him, featured characters that he had developed in his earlier scripts. He expressed this belief in a letter to DIC on November 15, 1984, and thereafter retained attorney Leo Fenster to handle the matter. On May 28, 1985, Fenster sent DIC a letter on Kling's behalf demanding proper credit and other relief. Fenster's letter was forwarded to George Downing, counsel for United Feature, who expressed concern to another attorney about Fenster's statement that HKP retained "certain rights in `characters' developed by Mr. Kling." On July 17, 1985, Jeffrey Wernick, counsel for DIC, sent a three-page letter to Fenster, stating in part:
 
 
 13
 . . . . Your client sought the "Developed by " credit in future adaptations of Robotman and Rainbow Brite. He is not entitled contractually to any credit on any adaptations of either property that he does not provide specific services on. Moreover, DIC is not the copyright owner of either property and could not in any event grant Mr. Kling credit on adaptations for which he provides no work. . . . I would suggest that you research into the copyrightability of characters contained within a literary work. Characters are not separate copyrightable elements and no protectible interest has been created therein in favor of Mr. Kling. I would further remind you that as is standard in the entertainment industry, the work performed by Mr. Kling was done as a work-for-hire for copyright purposes, and that DIC Enterprises is the rightful owner of all results and proceeds of his work.
 
 
 14
 . . . . We absolutely reject your request for compensation in any future publications of the two properties. DIC Enterprises itself has no such profit participation and collectively this company has developed these properties far more than your client has. As there is no contractual basis for your claim I must assume that you are basing same on a misinterpretation of paragraph 4 of the respective agreements. This misinterpretation is clearly evidenced by paragraph 8 of your letter dated May 28, 1985 in which you stated that we were to renegotiate terms for Mr. Kling on "any future adaptations, specials, or network series based on characters developed by Woody Kling" . . . . The underlined portion represents language which you have unilaterally inserted into the language of paragraph 4 of the two agreements without any basis whatsoever. That paragraph was intended to provide further compensation to Mr. Kling, if and in the event the actual shows he worked on were exploited in a fashion other than syndicated broadcast. [emphasis in original]
 
 
 15
 On July 25, 1985, Fenster informed Wernick that based on his response "there is no point in continuing any further negotiations" and listed Kling's demands regarding appropriate crediting. Fenster also notified Hallmark and United Feature in writing of the dispute.
 
 
 16
 On August 19, 1985, Downing sent Wernick a copy of Fenster's letter to United Feature. Downing stated that "it is imperative that this problem with Heywood Kling be worked out immediately so that we are not in danger of having a court interfere with United Media's [United Feature ] rights to exploit the ROBOTMAN television shows." On October 21, 1985, Wernick sent Fenster a draft agreement settling their dispute. This draft agreement stated in part that HKP "hereby irrevocably transfers and assigns to Releasee [DIC] all of Releasor's [HKP's] right, title and interest in and to any element of the Rainbow Brite and Robotman properties arising out of the Agreements." On October 23, Downing wrote Wernick to say that while the draft was satisfactory, he would have preferred "to see the phrase `(including any copyrights)' inserted after the word `interest' " in this part. Following discussions with Wernick, Fenster returned to him a revised agreement that completely deleted the provision addressing transfer of ownership. The parties ultimately entered into an agreement that settled the credit dispute but omitted all discussion of the issue of copyright ownership.
 
 C. Mary Kling's 1994 Visit to Blockbuster
 
 17
 Woody Kling died in 1988. On August 30, 1994, Mary Kling, Woody's widow and successor to all the assets of HKP, visited a Blockbuster Video store in Los Angeles with her son. She discovered that the store was renting video cassettes of television shows featuring Rainbow Brite characters, including the shows that utilized the scripts that her husband had written. Hallmark had released the first three Rainbow Brite specials on two video cassettes in 1985. Reviewing the store's video catalog, Mary Kling further discovered that United Feature had released the first three Robotman specials on two video cassettes in 1985 also. Until her Blockbuster visit in 1994, Mary Kling did not know about the release of these videos. Neither she nor her husband had authorized the making or distribution of video copies of the television shows.
 
 
 18
 In September 1994 Mary Kling sent letters to DIC asking for executed copies of the Rainbow Brite and Robotman contracts. DIC responded that it was unable to locate the contracts. During the following year Mary Kling made a number of phone calls to DIC concerning the release of the video cassettes, but her calls were never returned. In October 1995 Mary Kling sent DIC a letter concerning the distribution of the video cassettes and requesting an opportunity to negotiate a settlement of the matter. DIC responded by stating that her claims were baseless.
 
 D. Proceedings Below
 
 19
 Mary Kling filed a complaint against defendants Hallmark, DIC, Mattel, Inc., and United Feature in August 1997. She alleged copyright co-ownership and copyright infringement claims in the alternative.
 
 
 20
 In October 1997 the defendants moved for summary judgment. Mary Kling did not dispute that her co-ownership claims were barred by the statute of limitation, and the district court entered summary judgment on that basis. It held, however, that Mary Kling's infringement claim was not barred by the three-year statute of limitation, 17 U.S.C.S 507(b). The court reasoned that a cause of action accrues when a plaintiff knows or has reason to know of the injury upon which the claim is presented, Roley v. New World Pictures, Ltd., 19 F.3d 479, 481 (9th Cir. 1994), and the defendants had presented no evidence showing that Mary Kling, her husband, or HKP knew or should have known of the alleged infringement before August 30, 1994. "Instead," the court held, "the Defendants have merely presented evidence which indicates that Woody Kling was aware that DIC was repudiating Kling Productions' purported ownership interest."
 
 
 21
 The district court further explained that Mary Kling could not prevail insofar as her infringement claim was based on the allegation that she is a co-owner of the scripts, because a coowner of a copyright cannot be liable to another co-owner for infringement. See Zuill v. Shanahan, 80 F.3d 1366, 1369 (9th Cir. 1996) (citing Oddo v. Ries, 743 F.2d 630, 632-33 (9th Cir. 1984)). She could prevail, however, if she proved that the defendants were licensees and had exceeded the scope of their license. Ownership of a copyright vests initially in the author of the work, see 17 U.S.C. S 201(a), and there were genuine issues of material fact as to whether for copyright purposes Woody Kling was the author of the scripts or wrote them as "work[s] made for hire" under 17 U.S.C.S 201(b).[2] These issues, it held, were appropriate for resolution by the trier-offact upon a fully developed record.
 
 
 22
 Mary Kling filed a First Amended Complaint in June 1998. She alleged that the defendants had infringed her copyrights in the scripts by distributing video cassettes of the Rainbow Brite and Robotman programs, "thereby exceeding the scope of the license" set forth in the respective contracts. The defendants (other than United Feature) soon filed a second motion for summary judgment, relying on the same evidence submitted in support of their first motion. This time, they moved for (1) partial summary judgment on the ground that Mary Kling's damages were limited to those occurring not more than three years prior to the filing of her first complaint, and (2) full summary judgment on the ground of laches.
 
 
 23
 In August 1998 the district court granted the defendants' motion for full summary judgment. It held that Woody and Mary Kling had unreasonably delayed in bringing an action to establish their alleged ownership in the scripts:
 
 
 24
 A plaintiff knows or has reason to know of a claim for declaration of ownership when the plaintiff learns that the defendant is claiming sole ownership of the plaintiff's copyright. See Jackson v. Axton, 25 F.3d 884, 889 (9th Cir. 1994). And, once the plaintiff has grounds to sue for a declaration of ownership, unless the plaintiff is the "obvious owner" of the copyright at issue, the plaintiff's delay in filing a claim for declaration of ownership may bar the plaintiff's subsequent copyright infringement claim. See id. at 887 (discussing Neva, Inc. v. Christian Duplications Int'l, Inc., 743 F. Supp. 1533 (M.D. Fla. 1990)). Thus, the laches period begins to run from the date the plaintiff knows or has reason to know of a claim for declaration of ownership.
 
 
 25
 Woody Kling, the court ruled, was never the "obvious owner" of the scripts, and he had had "grounds to establish his ownership interest" since July 17, 1985, when DIC counsel Wernick wrote Kling's attorney Fenster claiming that "the work performed by Mr. Kling was done as a work-for-hire for copyright purposes, and that DIC Enterprises is the rightful owner of all results and proceeds of his work." The court stated that Mary Kling did not offer any excuse for her husband's failure to file an action seeking a declaration of ownership in the:
 
 
 26
 scripts at that time. Furthermore, it ruled, the defendants had shown actual prejudice from the delay as a result of (1) the unavailability of Woody Kling, a critical witness in the ownership dispute, due to his death, and (2) the "extensive licensing program" that Hallmark had undertaken for the Rainbow Brite characters.
 
 
 27
 In December 1998 the district court denied Mary Kling's motion for reconsideration and for a continuance pursuant to Federal Rule of Civil Procedure 56(f). The court also denied DIC's motion for attorneys' fees pursuant to 17 U.S.C. S 505.
 
 
 28
 Mary Kling filed a timely notice of appeal from the district court's award of summary judgment. DIC filed a timely notice of cross-appeal from the district court's denial of its motion for attorneys' fees.
 
 II. Analysis
 A. Standard of Review
 
 29
 We review a district court's grant of summary judgment de novo. See, e.g., Alameda Books, Inc. v. City of Los Angeles, 222 F.3d 719, 721-22 (9th Cir.2000) (citing Robi v. Reed, 173 F.3d 736, 739 (9th Cir.), cert. denied,__ U.S. __, 120 S. Ct. 375 (1999)). In so doing, we must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence. " Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520 (1991) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).
 
 
 30
 For the purposes of this appeal, we assume that the district court was correct in ruling that genuine issues of material fact exist as to whether for copyright purposes Woody Kling was the author of the Rainbow Brite and Robotman scripts or whether he wrote them as works for hire. See generally Community for Creative Non-Violence v. Reid, 490 U.S. 730, 751p-52 (1989). Our task is to determine whether such issues of fact also exist as to whether either or both of the Klings engaged in unreasonable delay by not filing an infringement claim until August 1997.
 
 B. Laches
 
 31
 1. "Obvious ownership" and copyright infringement
 
 
 32
 Laches is an equitable time limitation on a party's right to bring suit. Boone v. Mechanical Specialities Co., 609 F.2d 956, 958 (9th Cir. 1979). To obtain a judgment on this affirmative defense, a defendant must prove "both an unreasonable delay by the plaintiff and prejudice to itself. " Couveau v. American Airlines, 218 F.3d 1078, 1083 (9th Cir. 2000) (citations omitted); see also Neighbors of Cuddy Mountain v. United States Forest Serv., 137 F.3d 1372, 1381 (9th Cir. 1998); Clamp Mfg. Co., Inc. v. Enco Mfg. Co., Inc., 870 F.2d 512, 515 (9th Cir. 1989).
 
 
 33
 The critical question in this case concerns the first requirement of laches: unreasonable delay by the plaintiff. Specifically, we must decide the point at which the period of delay begins in a copyright infringement case.
 
 
 34
 We begin our analysis with the general rule for laches: any delay is to be measured from the time that the plaintiff knew or should have known about the potential claim at issue. "An `indispensable element of lack of diligence is knowledge, or reason to know, of the legal right, assertion of which is "delayed".' " Portland Audubon Soc'y v. Lujan, 884 F.2d 1233, 1241 (9th Cir. 1989) (quoting City of Davis v. Coleman, 521 F.2d 661, 667 (9th Cir. 1975)). "There must, of course, have been knowledge on the part of the plaintiff of the existence of the rights, for there can be no laches in failing to assert rights of which a party is wholly ignorant, and whose existence he had no reason to apprehend." Halstead v. Grinnan, 152 U.S. 412, 417 (1894). See also Advanced Cardiovascular Sys., Inc. v. Scimen Life Sys., Inc, 988 F.2d 1157, 1161 (Fed. Cir. 1993) ("When applying the equitable doctrine of laches in order to bar a claim, the period of delay is measured from when the claimant had actual notice of the claim or would have reasonably been expected to inquire about the subject matter.").
 
 
 35
 In its first summary judgment order, the district court held that Mary Kling's infringement claim was not barred by the copyright statute of limitation, 17 U.S.C. S 507(b), because the defendants had failed to show that either of the Klings knew or had reason to know about the defendants' infringement of their alleged copyright before Mary Kling's August 1994 visit to Blockbuster. The question then arises, if the Klings had no actual or constructive knowledge of any infringement, how could the district court subsequently reject the infringement claim on the ground of laches?
 
 
 36
 The district court relied in its second summary judgment order on this court's decision in Jackson v. Axton, 25 F.3d 884 (9th Cir. 1994). Jackson involved a piano player who had assisted in the initial recording of a song ("Joy to the World") in 1970 and later contended that he co-wrote the song. Id. at 885-86. In 1975 Hoyt Axton, the holder of the song's registered copyright, told Jackson he had nothing to do with the writing of the song. Id. at 886. Jackson filed an action to establish his co-authorship in 1992. Id. After holding that laches may be a defense to copyright co-ownership claims, we affirmed summary judgment for Axton on this ground. Id. at 887-89. "Jackson's claim was brought late," we held. "He has been able to sue since at least 1975, and possibly since 1971, when he learned that Axton claimed sole ownership of the Song." Id. at 889.
 
 
 37
 The holding in Jackson involves copyright co-ownership, not infringement, and we emphasized that point. We stated specifically that "laches is not applied here to a `future violation' . . . . This is not an infringement case but one seeking a declaration of coauthorship." Id. at 888. Overlooking these express statements, the district court rested its analysis on an earlier part of the Jackson decision, the purpose of which was to summarize the parties' views on the threshold question whether laches applies to copyright co-ownership claims at all. See id. at 886-88. In discussing a district court decision from Florida, Neva, Inc. v. Christian Duplications Int'l, Inc., 743 F. Supp. 1533 (M.D. Fla. 1990), which the appellant had argued stood for the proposition that laches never applied in the co-ownership context, we wrote:
 
 
 38
 In Neva, the plaintiff, the registered copyright owner, sued for infringement and included a claim for a declaration of ownership. Appellees explain that laches was not applied to bar the plaintiff's declaration claim because the plaintiff, the obvious owner of the copyright, never needed to prove his ownership prior to bringing the infringement claim. Delay in seeking an unnecessary declaration could not be used to bar a recognized copyright owner's assertion of his rights. Thus, Appellees conclude, Neva did not hold that laches is unavailable as a defense; Neva held merely that laches was inapplicable in that case. 743 F. Supp. at 1548 . . . .
 
 
 39
 Jackson, 25 F.3d at 887. On the basis of that passage, the district court in the case before us held that a plaintiff who is not the "obvious owner" of a copyright must promptly sue for declaration of ownership once he learns that another party claims sole ownership of the copyright. Failure to do so, it said, would expose the plaintiff to a laches defense later in either an ownership or infringement case: "[T]he plaintiff's delay in filing a claim for declaration of ownership may bar the plaintiff's subsequent copyright infringement claim." The district court specifically rejected the plaintiff's argument "that the laches period begins to run from the date the Plaintiff knew or had reason to know she had a claim for copyright infringement."
 
 
 40
 We decline to adopt the district court's reasoning. First, the reference in Jackson to the "obvious owner" plaintiff in Neva is not even remotely a holding. It was certainly not intended to set a rule, by negative implication, for the prospective application of the laches doctrine in the wholly different context of copyright infringement suits. Indeed, we expressly stated that the case did not involve the application of laches to an infringement claim. 25 F.3d at 888.
 
 
 41
 The rule adopted by the district court -requiring that a "non-obvious owner" file a prophylactic action for a declaration of copyright ownership, as a condition precedent to any subsequent infringement suit over a violation that has not yet occurred, simply because the rights of the "non-obvious owner" are questioned -is not consistent with the general rule for laches. A claim for copyright infringement has two elements: "(1) ownership of the copyright; and (2) infringement -that the defendant copied protected elements of the plaintiff's work." Three Boys Music Corp. v. Bolton, 212 F.3d 477, 481 (9th Cir. 2000) (citing Smith v. Jackson, 84 F.3d 1213, 1218 (9th Cir. 1996)); see also Mai Sys. Corp. v. Peak Computer, Inc., 991 F.2d 511, 517 (9th Cir. 1993) (stating that "plaintiff must prove ownership of a copyright and a ` "copying" of protectable expression' beyond the scope of a license") (citation omitted). The district court's rule triggers the laches period for an infringement claim at the time a plaintiff knows or should know about a dispute as to only the first of these two elements, ownership -regardless or whether any actual or impending infringement claim exists at the time. The rule is not equitable: it allows for the defeat of a legal claim even though the plaintiff has not delayed in asserting his rights with regard to that claim, and in fact the claim has not yet arisen.
 
 
 42
 Indeed, the defendants cite no infringement cases -and our research has disclosed none -holding that laches is proper because the plaintiff failed to sue for a declaration of ownership earlier, absent any infringing conduct. To the contrary, in applying the laches doctrine, courts have exclusively focused on plaintiffs' prior knowledge of actual or impending copyright infringements. See, e.g., Kepner-Tregoe, Inc. v. Executive Dev., Inc., 79 F. Supp.2d 474, 486 (D.N.J. 1999) ("The duty to bring an action for copyright infringement does not arise . . . until the plaintiff knows of the infringement."); Peer Int'l Corp. v. Luna Records, Inc., 887 F. Supp. 560, 567 (S.D.N.Y. 1995) (discussing "passage of time between plaintiffs' knowledge of an infringing act and the filing of a suit"); Allen-Myland, Inc. v. International Business Machs. Corp., 746 F. Supp. 520, 550 (E.D. Pa. 1990) (measuring "alleged delay" for purposes of laches by date of copyright infringement alleged in counterclaim); see also 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright S 12.06, at 12124.16 (1999) ("[T]he period of delay for the determination of laches measures from the time of the act of infringement that is being sued upon."); cf. GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1209 (9th Cir. 2000) (stating that this court allows laches to bar trademark infringement cases "only where the trademark holder knowingly allowed the infringing mark to be used without objection for a lengthy period of time") (citation omitted).[3]
 
 
 43
 The district court's rule for "non-obvious owners " is plainly unworkable. The ownership of intellectual property is frequently a subject of dispute. To require every owner whose right was not "obviously" established to sue for a declaration of ownership whenever a dispute arises or to forfeit his right to seek relief against possible infringements in the future, could engender much needless litigation. The rule would also encourage would-be scavengers to assert meritless claims of ownership in the hope that non-obvious owners would fail to sue and therefore render themselves unable to challenge future infringements. The district court's rule would dramatically expand the laches doctrine, lead to inefficient results, and undermine the copyright laws' goal of promoting "stability of title." See Zuill v. Shanahan, 80 F.3d at 1370. We therefore decline to adopt it.
 
 
 44
 This is not to say that the starting point for laches will always be the same as the starting point for the statute of limitations for copyright infringement. The statute provides that "[n]o civil action shall be maintained . . . unless it is commenced within three years after the claim accrued. " 17 U.S.C. S 507(b). Applying this statute, this court has held that a "cause of action for copyright infringement accrues when one has knowledge of a violation or is chargeable with such knowledge." Roley, 19 F.3d at 481 (citing Wood v. Santa Barbara Chamber of Commerce, Inc., 507 F. Supp. 1128, 1135 (D. Nev. 1980)). But while the statute of limitations is triggered only by violations -i.e., actual infringements -the laches period may be triggered when a plaintiff knows or has reason to know about an impending infringement. Judge Learned Hand explained the equitable basis for this distinction:
 
 
 45
 It must be obvious to every one familiar with equitable principles that it is inequitable for the owner of a copyright, with full notice of an intended infringement, to stand inactive while the proposed infringer spends large sums of money in its exploration, and to intervene only when his speculation has proved a success. Delay under such circumstances allows the owner to speculate without risk with the other's money; he cannot possibly lose, and he may win.
 
 
 46
 Haas v. Leo Feist, Inc., 234 F. 105, 108 (S.D.N.Y. 1916). Thus, a copyright holder would be vulnerable to the laches defense if he had knowledge of a planned infringement more than three years prior to filing his action, even if he complied with the statute of limitations by filing less than three years after the infringement actually began. Knowledge that a defendant sincerely (but erroneously) believed it maintained ownership of the copyright might be relevant to a plaintiff's knowledge that an infringement would likely occur in the future, and it might in some cases obligate the plaintiff to investigate the defendant's plans regarding the exploitation of that copyright.[4] But knowledge of contested ownership without more is insufficient to run the laches period for future infringement claims, because such knowledge relates to only one of the two elements of the copyright infringement cause of action.
 
 
 47
 2. Knowledge of actual or impending infringements
 
 
 48
 The defendants argue that even if we do not adopt the district court's "obvious owner" rule, we should still hold that summary judgment was proper on the basis of laches. We, of course, may affirm a judgment on any ground supported by the record, regardless of whether the district court relied upon, rejected, or even considered that ground. Washington v. Confederated Bands & Tribes of the Yakima Indian Nation , 439 U.S. 463, 476 n.20 (1979); Cigna Property & Cas. Ins. Co. v. Polaris Pictures Corp., 159 F.3d 412, 418-19 (9th Cir. 1998). 11042 _
 
 
 49
 The district court concluded in its first summary judgment order, in rejecting the defendants' statute of limitations argument, that there was no evidence that the Klings knew or should have known about the actual infringement of their alleged copyright in the Rainbow Brite and Robotman scripts -the release of the specials on video -prior to Mary Kling's visit to Blockbuster on August 30, 1994. The defendants dispute this conclusion on appeal. Because we are concerned with laches and not the statute of limitations, in accordance with the discussion set forth above we ask a somewhat broader question: whether Woody or Mary Kling knew or should have known of an actual or impending infringement before 1994. We conclude that the evidence relied on by the defendants regarding this question is not sufficient to support summary judgment.
 
 
 50
 The defendants emphasize, as did the district court, the letter of July 17, 1985, sent to Woody Kling's attorney Fenster by DIC counsel Wernick in the midst of the 1984-85 dispute about Kling's card credit. In his letter, Wernick "remind[ed]" Fenster "that as is standard in the entertainment industry, the work performed by Mr. Kling was done as a work-for-hire for copyright purposes, and that DIC Enterprises is the rightful owner of all results and proceeds of his work." This is the assertion of adverse ownership that, the district court concluded, should have led Kling to sue for a declaration of ownership. While we have already rejected this analysis, the question remains whether, as a matter of law, the letter reasonably obligated Kling to inquire about DIC's activities to determine whether and how it intended to exploit its claimed ownership rights in the scripts. We think not.
 
 
 51
 Context is important here. Wernick's assertion was made in the middle of a somewhat blustery, condescending, and dismissive letter, the work of a lawyer "blowing smoke" in an attempt to discourage a potential adversary of a client from proceeding further.[5] The letter, however, did not allude to any current or planned use of the Rainbow Brite or Robotman specials written by Kling, but rather focused on Kling's complaint about his insufficient receipt of credit for these television programs. Wernick's assertion of ownership was made in this context, not as a claim that DIC or Hallmark was free to use or adapt Kling's scripts as they saw fit. Indeed, by stating that the contract "was intended to provide further compensation to Mr. Kling, if and in the event the actual shows he worked on were exploited in a fashion other than syndicated broadcast," Wernick's letter arguably bolsters Mary Kling's infringement claim.
 
 
 52
 To the extent that ownership of the script copyrights was ever at issue in the credit dispute, Kling refused to accede to the defendants' claims and the defendants failed to press the point. The draft agreement sent by Wernick to Fenster on October 21, 1985, provided that Kling would "irrevocably transfer[ ] and assign[ ]" all ownership interests in the Rainbow Brite and Robotman scripts to DIC. Counsel for United Feature informed Wernick that he would have made this language a specific transfer and assignment of copyright ownership. Fenster, however, struck the language from the draft agreement, and it was not part of the final two agreements reached in late 1985. This negotiation process thus supports Mary Kling's argument that her husband retained his ownership rights in the scripts (assuming some existed to begin with) and therefore did not need to investigate possible plans by DIC to exploit those rights or assign them to others.
 
 
 53
 The defendants also argue that the two agreements settling the credit dispute show that Woody Kling knew "that video cassettes were a medium for exploiting the Rainbow Brite and Robotman properties." We disagree. The agreements resolved Kling's claim for credit for the use of fictional characters developed by him in "future episodes " not written by him.[6] This case, by contrast, involves the defendants' distribution on video of the six television specials that were based on Kling's own scripts. In the agreements, Kling retained his right to seek remedies in the event that another party denied him proper credit for future adaptations of his characters, on television, video, or another medium. He did not authorize or acknowledge that the defendants could thereafter exploit his six scripts for media other than "syndication broadcast" without renegotiation, in violation of the terms of his 1983 and 1984 contracts with DIC.
 
 
 54
 Finally, the defendants point to a November 1985 letter by Kling's counsel containing a disparaging reference to the recent release of a feature film entitled "Rainbow Brite and The Star Stealer."[7] This reference, in the defendants' view, shows that Woody Kling "actively patrolled Kling's perceived rights in both the Rainbow Brite and Robotman properties." Because the defendants were "openly and continuously" conducting a national distribution of the video cassettes, they argue, Kling must have known about the video release of the six specials. The defendants' argument is entirely speculative. The fact that Kling or his lawyer took note of a feature film reviewed in a daily newspaper sheds no light on whether they were patrolling the children's aisles of video stores looking for infringements of Kling's alleged copyrights. Nor do we believe that the release of the film put Kling on any kind of inquiry notice: the "Star Stealer" movie did not involve a script written by Kling, and it is only those scripts to which Mary Kling asserts copyrights. The record simply does not support the conclusion that, as a matter of law, a reasonably diligent plaintiff would have discovered that the defendants were distributing the Rainbow Brite and Robotman video cassettes prior to Mary Kling's visit to Blockbuster in 1994.
 
 
 55
 This court has previously observed that because a claim of laches "depends on a close evaluation of all the particular facts in a case, it is seldom susceptible of resolution by summary judgment." Couveau, 218 F.3d at 1083 (citing Bratton v. Bethlehem Steel Corp., 649 F.2d 658, 666-67 (9th Cir. 1980)). This observation holds true in the present case. There is, at the very least, a genuine issue of material fact as to whether Woody or Mary Kling knew or had reason to know about the actual or impending infringement of their alleged copyrights prior to August 1994. Summary judgment was improper.[8]
 
 C. Limitation on Damages
 
 56
 In the alternative, the defendants ask us to rule that the copyright statute of limitations, 17 U.S.C. S 507(b), prohibits Mary Kling from obtaining on remand any damages that accrued more than three years before she filed this action. "Separate and apart from when her claims accrued, " they argue, "Plaintiff is limited to damages allegedly accruing within three years of filing her initial complaint. " The defendants rely on our holding in Roley v. New World Pictures, a case in which the plaintiff had knowledge of early acts of infringement, filed his action more than three years later (but within three years of subsequent acts of infringement), and attempted to recover damages for all infringing acts under a "rolling statute of limitations": the theory that "so long as any allegedly infringing conduct occurs within the three years preceding the filing of the action, the plaintiff may reach back and sue for damages or other relief for all allegedly infringing acts." 19 F.3d at 480-81. We rejected this theory, stating that "[i]n a case of continuing copyright infringements, an action may be brought for all acts that accrued within the three years preceding the filing of the suit." Id. at 481. Mary Kling responds that Roley and every other holding cited by the defendant are inapposite because they involved plaintiffs who knew about some infringing acts that occurred more than three years prior to filing suit, whereas she filed this case within three years of the time she learned about any alleged infringement at all -her August 1994 visit to Blockbuster. Roley, she argues, actually supports her position by making clear that an infringement claim accrues only when a plaintiff knows or has reason to know of a violation.
 
 
 57
 While the defendants' argument raises an interesting, apparently unresolved issue, it is not one that we have jurisdiction to decide on the present appeal. "Even if valid, the argument would serve only to limit [Kling's] potential recovery on remand, not to support the district court's award of summary judgment." Couveau, 218 F.3d at 1084. Because partial summary judgment orders do not end the litigation on the merits, they are not generally appealable final orders under 28 U.S.C. S 1291. Williamson v. UNUM Life Ins. Co. of America, 160 F.3d 1247, 1250 (9th Cir. 1998) (citations omitted). Here, the district court did not address the defendants' motion for partial summary judgment at all. Furthermore, while the doctrine of laches and statutes of limitations involve related concerns, they are fundamentally distinct defenses. See Jackson, 25 F.3d at 887 n.2, 888. Because the defendants' argument for limited damages is not "inextricably intertwined" with the laches defense on which they succeeded below, pendent appellate jurisdiction does not apply. See Swint v. Chambers County Comm'n, 514 U.S. 42, 49-51 (1995); Couveau, 218 F.3d at 1084 (citations omitted). We therefore leave this issue for another day.
 
 D. Attorneys' Fees
 
 58
 Because we reverse the district court's grant of summary judgment to defendants, they are clearly not the "prevailing party" for purposes of attorneys' fees under 17 U.S.C. S 505. We therefore affirm the district court's denial of their fee motion.
 
 III. Conclusion
 
 59
 We reverse the district court's order on summary judgment and remand for further proceedings. We affirm the district court's order on attorneys' fees.
 
 
 60
 REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.
 
 
 
 Notes:
 
 
 [1]
 Honorable William L. Dwyer, Senior United States District Judge for the Western District of Washington, sitting by designation.
 
 
 [2]
 In July 1996 Mary Kling had sent applications to the Register of Copyrights seeking registration of the Rainbow Brite and Robotman scripts. She obtained certificates of registration for all but one of the scripts. Because she had waited 12 years to seek these certifications, the district court held that they were not entitled to a presumption of validity. It elected "to give the certificates no weight whatsoever."
 
 
 [3]
 In Lottie Joplin Thomas Trust v. Crown Publishers, Inc., 456 F. Supp. 531 (S.D.N.Y. 1977), aff'd, 592 F.2d 651 (2d Cir. 1978), the rights to a Scott Joplin song had been wrongfully assigned to a publishing company in 1959. Counsel for the plaintiff trust learned about the assignment in 1967. The publishing company released a recording of the song in 1974. The court held that the trust was not barred by laches from pursuing an infringement claim. It explained in part that the trust's delay was not unreasonable, because "[c]ounsel to the Trust could have reasonably concluded that," prior to the time the movie "The Sting" brought Joplin's works to prominence, "enforcement of the copyright was not worth the cost of litigation, especially because no infringing phonograph record was on the market." Id. at 534.
 
 
 [4]
 "[T]he law is well settled that, where the question of laches is in issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry." Johnston v. Standard Mining Co., 148 U.S. 360, 370 (1893).
 
 
 [5]
 The following month Wernick confided to counsel for United Feature that although DIC had intended to retain Kling on a work-for-hire basis with respect to the three Robotman scripts, their contract did not "expressly address the point."
 
 
 [6]
 The agreements provided in relevant part that the parties "hereto understand and agree that HKP and Kling do not waive their right to damages or remedies in equity or law, in the event that any third party broadcasts or publishes any future episodes of [`Rainbow Brite' or `Robotman and Friends'] on television, cable television, motion pictures or video cassette granting credit to any third party as the developer of the characters developed by Kling."
 
 
 [7]
 In this letter, Fenster informed Wernick that Woody Kling was willing to limit his credit demands to the television industry. "Frankly," Fenster wrote, "after reading the Los Angeles Times review of the motion picture, `Rainbow Brite and The Star Stealer', it behooves my client not to be associated with that medium as produced by your client."
 
 
 [8]
 The defendants do not argue that laches would be justified based on the delay between Mary Kling's discovery of the alleged infringement in August 1994 and her filing suit in August 1997. See generally Advanced Cardiovascular Sys., 988 F.2d at 1161 ("When a limitation on the period for bringing suit has been set by statute, laches will generally not be invoked to shorten the statutory period.") (citation omitted). Because we conclude that the defendants are unable to establish unreasonable delay as a matter of law, we need not decide whether they have established sufficient prejudice to warrant summary judgment.