**DANJAQ LLC, a Delaware limited liability company; Metro–Goldwyn–Mayer, Inc., a Delaware corporation; United Artists Corporation, a Delaware corporation; United Artists Pictures Inc., a Delaware corporation; Seventeen Leasing Corporation, a Delaware corporation; Eighteen Leasing Corporation, a Delaware corporation; MGM/UA Communications Co., Plaintiffs–Appellees,**

v.

**SONY CORPORATION, a Japanese corporation; Sony Pictures Entertainment, Inc., a Delaware corporation; Columbia Pictures Television, Inc., a Delaware corporation; John Calley, an individual, Defendants,**

**and**

**Kevin O'Conovan McClory; Spectre Associates, Inc., an entity of unknown capacity, Defendants–Appellants.**

No. 00–55781.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 11, 2001

Filed Aug. 27, 2001

Kevin McClory, defendant-appellant, in propria persona.

Paul J. Cohen, Segal, Cohen & Landis, Beverly Hills, California, and Lucile Hotton Lynch, Carlsbad, California (argued), for defendant-appellant Spectre Associates, Inc.

Marc A. Becker, Munger, Tolles & Olson, LLP, Los Angeles, California, and Pierce O'Donnell, O'Donnell & Shaeffer, LLP, Los Angeles, California (argued), for the plaintiffs-appellees.

Before: McKEOWN and FISHER, Circuit Judges, and HAGEN,* District Judge.

* Honorable David Warner Hagen, United States District Judge for the United States District Court for Nevada, sitting by designation.

McKEOWN, Circuit Judge:

"We have all the time in the world."

 —Epitaph for Mrs. Bond in
*For Your Eyes Only*
(Danjaq Productions 1981)

"Equity aids the vigilant."

 —Anonymous

Every so often, the law shakes off its cobwebs to produce a story far too improbable even for the silver screen—too fabulous even for the world of Agent 007. This is one of those occasions, for the case before us has it all. A hero, seeking to redeem his stolen fortune. The villainous organization that stands in his way. Mystery! International intrigue! And now, not least of all, the dusty corners of the ancient law of equity.

More specifically, this case arises out of an almost forty-year dispute over the parentage and ownership of a cultural phenomenon: Bond. James Bond.[1] We are confronted with two competing narratives, with little in common but their endpoint. All agree that James Bond—the roguish British secret agent known for martinis (shaken, not stirred),[2] narrow escapes,[3] and a fondness for fetching paramours with risque sobriquets[4]—is one of the great commercial successes of the modern cinema. The parties dispute, however, the source from which Agent 007 sprang.

Appellees Danjaq LLC and a handful of other companies or partnerships that are in the business of making and/or distributing James Bond films (collectively, "Danjaq"), contend that James Bond is largely the creation of the author Ian Fleming and that—with one narrow exception—they own the rights to Bond, which were passed on to them over the years by Fleming and producers Harry Saltzman and Albert "Cubby" Broccoli. Appellants Kevin O'Donovan McClory and Spectre Associates, Inc. ("McClory") urge a different narrative. They contend that McClory transformed the supposedly violent and alcoholic James Bond of the Fleming books into the movie character who is so beloved, recognizable and marketable, and that they have a significant stake in the Bond movies, which stems from rights to *Thunderball* obtained long ago.

Compelling though the details of this dispute may be, they are largely subsidiary to the issues that confront us here. Instead, we are called upon to determine whether McClory waited too long to claim his piece of the pie—whatever that share might have been. We conclude that McClory's claims are barred in their entirety by the doctrine of laches and, on that basis, affirm the district court's dismissal of McClory's suit.

### THE PLOT

The genesis of this dispute can be traced to the late 1950s, when efforts were made to bring the literary character James Bond to the screen. Ian Fleming had previously written seven books featuring James Bond[5] but, according to McClo-

---

**1.** *Dr. No* (Danjaq Productions 1962).

**2.** *Dr. No* ("A medium vodka dry martini—with a slice of lemon peel. Shaken, not stirred.").

**3.** *See, e.g., Never Say Never Again* (Warner Brothers 1983) (escaping from man-eating vultures); *Goldfinger* (Danjaq Productions 1964) ("No, Mr. Bond, I expect you to die!"; escaping from metal-cutting laser beam).

**4.** As one might imagine, we do not refer here to the long-suffering Miss Moneypenny. We leave further investigation to the reader. *See, e.g., Moonraker* (Danjaq Productions 1979); *Diamonds Are Forever* (Danjaq Productions 1971); *Goldfinger*.

**5.** Those seven books are *Casino Royale* (1953), *Live and Let Die* (1954), *Moonraker* (1955), *Diamonds Are Forever* (1956), *From Russia with Love* (1957), *Doctor No* (1958), and *Goldfinger* (1959).

ry, had little success transforming these books into a screenplay. Thus, Fleming collaborated with McClory and a hired screenwriter, Jack Whittingham, in an effort to produce a movie script. Together, they penned various letters, drafts, and other "script materials" that were the precursor to the film *Thunderball*. The three of them produced a *Thunderball* screenplay that, according to McClory, differed significantly from Fleming's books. (Although not defined with specificity, McClory generally refers to these works as the "McClory Scripts.") In particular, the screenplay deliberately modified the James Bond character created by Fleming. (Thus, claims McClory, this screenplay is the source of the "cinematic James Bond" character, as opposed to the literary James Bond character.) Morever, according to McClory, the script materials introduced SPECTRE,[6] the villain Ernst Stavro Blofeld, and the theme of nuclear blackmail.

In 1961, unbeknownst to McClory, Fleming wrote his next book—*Thunderball*. It was published that same year, and credited Fleming as the sole author, with no mention of McClory or Whittingham. McClory and Whittingham brought suit in England, alleging that the book infringed upon the *Thunderball* screenplay.

At the same time, Danjaq was moving forward with plans to make James Bond movies. Still in 1961, it commissioned another writer, Richard Maibaum, to write a *Thunderball* screenplay. According to McClory, this screenplay is the origin of Danjaq's various infringing acts. He argues that Maibaum's screenplay was based on the earlier *Thunderball* scripts, as well as the infringing *Thunderball* book, and that it lifted from them the cinematic James Bond character, SPECTRE, and the theme of nuclear blackmail. This con-

tention is disputed; Danjaq's president testified at his deposition that Maibaum did not have access to the McClory scripts, although he admitted that Maibaum likely had the book *Thunderball*, in which McClory had an interest.

In order to sidestep the legal disputes over *Thunderball*, Saltzman and Broccoli decided that they would instead make *Dr. No* as the first Bond movie. Maibaum was again hired as the screenwriter. And, according to McClory, Maibaum again incorporated elements from the earlier *Thunderball* scripts. Danjaq denies this allegation. The movie *Dr. No* was released in 1962. That same year, based on Fleming's transfer to Danjaq of the film and television rights to his novels and Bond stories, Danjaq teamed up with United Artists to produce Bond films.

At the same time, the litigation over the book *Thunderball* was continuing in Britain. In late 1963, Fleming ultimately admitted "[t]hat the novel reproduces a substantial part of the copyright material in the film scripts"; "[t]hat the novel makes use of a substantial number of the incidents and material in the film scripts"; and "[t]hat there is a general similarity of the story of the novel and the story as set out in the said film scripts." The suit settled within weeks, and Fleming assigned some set of his rights in *Thunderball*—the extent of which remains in dispute—to McClory.

The next significant event occurred in 1965, when McClory granted Danjaq a ten-year license to make a movie based on *Thunderball*. The movie *Thunderball* was released later that year.

In the mid–1970s, McClory began writing a new James Bond script, together with Sean Connery and the British spy novelist Len Deighton. This led to a flurry of litigation. Notably, in 1976, McClory and Connery sued Broccoli, United Artists

**6.** SPECTRE (*Sp* ecial *E* xecutive for *C* ounter–Espionage, *T* errorism, *R* evenge and *E* xtortion) is the organization that James Bond battled against in the early movies, as well as the name of one of the plaintiffs in this suit.

and Danjaq, claiming that the forthcoming movie *The Spy Who Loved Me* infringed upon the script that they were then preparing (entitled *James Bond of the Secret Service,* or *Warhead* ) and, among other remedies, seeking to enjoin the defendants from infringing upon McClory's rights in the novel *Thunderball.* Two months later, McClory and Connery abandoned their attempt to enjoin the release of *The Spy Who Loved Me,* which was then released in 1977.

Although that 1976 case is the end of the historical litigation relevant here, it was not the end of the dispute between the parties. Between 1978 and 1983, United Artists and the trustees of Fleming's estate sought to prevent McClory from releasing *Never Say Never Again,* a remake of *Thunderball.* And even after that litigation ended, the dispute raged on. In 1986, McClory cabled the chairman of MGM/UA, as well as the law firm of Latham & Watkins, to inform them that the Bond pictures infringed on his rights in *Thunderball.* In 1987, he filed a correction registration with the U.S. Copyright Office regarding the book *Thunderball,* listing himself and Whittingham as co-authors of the book. And in 1988, SPECTRE placed full-page and multi-page ads in *Variety,* stating that its rights to James Bond were being infringed by MGM/UA and Danjaq. Despite this flurry of public accusations, McClory took no legal action.

Fast forward to 1997, and the events that spawned the present litigation. By that time, Danjaq had produced movie after movie, and James Bond had become a cinematic icon and a huge box office success. In October of 1997, Sony acquired McClory's rights—whatever they were—to make James Bond movies and announced its plans to begin doing so. In January 1998, Danjaq filed suit, alleging thirteen separate causes of action, against Sony, Columbia Pictures and McClory, among others. Sony and Columbia struck back with nine counterclaims of their own.

Later that same year, Judge Rafeedie enjoined Sony from making James Bond movies. *Danjaq, LLC v. Sony Corp.,* 1998 WL 957053, (C.D.Cal. July 29, 1998). That injunction was affirmed by this court. *See Danjaq, LLC v. Sony Corp.,* 165 F.3d 915, (9th Cir. Nov.19, 1998). In March 1999, Sony and Columbia entered into a stipulated dismissal with Danjaq. The only claim that remained in the suit was Sony's third cause of action against Danjaq, for "Damages and Profits from Copyright Infringement." That claim was assigned back to McClory.

Thus, the various roles had been cast, with at least two of the original actors remaining in the play. The suit now pitted McClory against Danjaq. The crux of McClory's claim was that certain of the Bond movies released over the past thirty-six years infringed on McClory's rights under United States copyright law. Because, McClory argued, he possessed the rights to both the novel *Thunderball* and the materials developed during the writing of the initial *Thunderball* script, he also possessed the rights to certain plot elements that first appeared in those works: namely, the "cinematic James Bond" character, SPECTRE, the villain Ernst Stavro Blofeld, and the theme of nuclear blackmail. According to Danjaq, this was the first time McClory ever made such a claim.

We pause to note that it is not clear which movies McClory intends to contest in this litigation. Originally, McClory's counterclaim listed *all* of the eighteen James Bond movies that Danjaq had released to that point.[7] In his briefs on

---

**7.** Those are: *Dr. No* (1962); *From Russia with Love* (1963); *Goldfinger* (1964); *Thunderball* (1965); *You Only Live Twice* (1967); *On Her Majesty's Secret Service* (1969); *Dia-* *monds Are Forever* (1971); *Live and Let Die* (1973); *The Man with the Golden Gun* (1974); *The Spy Who Loved Me* (1977); *Moonraker*

appeal, however, McClory has contested only eight of the movies—*Dr. No, From Russia with Love, Goldfinger, Thunderball, You Only Live Twice, Diamonds Are Forever, The Spy Who Loved Me,* and *The World Is Not Enough*—as well as "any and all infringements included in DVDs and any other new media." For purposes of this appeal, we consider only these eight movies and the assorted infringements allegedly contained in other media.

Following several delays and requests for continuances, the district court held a bench trial on laches. To the apparent surprise of both sides, McClory did not appear. Danjaq moved unsuccessfully to dismiss the case for failure to prosecute, and then put on its sole witness, company president Michael Wilson, who testified for much of the day. At the end of the day, McClory's attorney informed the court that McClory would be able to testify two days later. The court agreed to the delay, and set a date for a trial on infringement in the event it found no laches. However, two days later, McClory again failed to appear. His attorney stated that he had not heard from McClory, and that McClory "would [not] contribute much more to what is in the record." With that representation, the court proceeded with closing arguments.

The next morning, the court issued its ruling that McClory's counterclaim was barred by laches. In the written order that followed, the court stated that the evidence in the case was closed because of "the prejudice to the Court's schedule and the economic prejudice to counterdefendants caused by McClory's failure to appear." On the substance of the laches issue, the court concluded that McClory had known of the alleged infringement since at least 1961, and that his only suit to enforce any rights against Danjaq was the 1976 litigation, which was unrelated to the claims presented here. Thus, there had been a delay of at least twenty-one years—and more likely, thirty-six years—between McClory's knowledge of the potential claims and the initiation of litigation. The court went on to conclude that Danjaq had presented "overwhelming and uncontroverted evidence of substantial prejudice due to McClory's delay."

Finally, the court found no evidence of "piratical conduct" or deliberate infringement that would trump the delay in bringing suit; on the contrary, the court noted, Danjaq acknowledged McClory's limited rights in *Thunderball* and obtained a license from McClory for these rights. The court dismissed McClory's case with prejudice.

McClory timely appealed, claiming that the district court erred by: (1) concluding that Danjaq had established the elements of laches; (2) concluding that Danjaq was not guilty of any "naked infringement" that would invalidate a defense of laches; (3) applying laches to elements of the claim that were not susceptible to such a bar; (4) denying McClory's request for a continuance; and (5) bifurcating the trial. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## THE REVIEW

### I. LACHES

■■■ The primary issue before the district court was Danjaq's contention that McClory's claim was barred by laches. Laches is an equitable defense that prevents a plaintiff, who " 'with full knowledge

(1979); *For Your Eyes Only* (1981); *Octopussy* (1983); *A View to a Kill* (1985); *The Living Daylights* (1987); *License to Kill* (1989); *GoldenEye* (1995); and *Tomorrow Never Dies*

(1997). In addition, after this litigation had already commenced, Danjaq released *The World Is Not Enough* in 1999.

of the facts, acquiesces in a transaction and sleeps upon his rights.'" *S. Pac. Co. v. Bogert*, 250 U.S. 483, 500, 39 S.Ct. 533, 63 L.Ed. 1099 (1919) (McReynolds, J., dissenting) (citing *Hayward v. Eliot Nat'l Bank*, 96 U.S. 611, 24 L.Ed. 855 (1877)). In the copyright context, the most-repeated justification for the doctrine was penned by Judge Learned Hand:

> It must be obvious to every one familiar with equitable principles that it is inequitable for the owner of a copyright, with full notice of an intended infringement, to stand inactive while the proposed infringer spends large sums of money in its exploitation, and to intervene only when his speculation has proved a success. Delay under such circumstances allows the owner to speculate without risk with the other's money; he cannot possibly lose, and he may win.

*Haas v. Leo Feist, Inc.*, 234 F. 105, 108 (S.D.N.Y.1916). To demonstrate laches, the "defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself." *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir.2000).

## A. STANDARD OF REVIEW

The proper standard of review, although usually a straightforward inquiry, is less than obvious here, because the procedural posture of the case is not straightforward. At first blush, it appears that the district court bifurcated the issues of laches and liability, conducted a bench trial on laches and issued findings in the form of an order. This appeared to have been the understanding of the parties before the district court, and it was certainly their characterization at oral argument before this court. The parties urge us to review the facts for clear error, and the

overall finding of laches for abuse of discretion.

The difficulty, however, is that the district court did not simply issue findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. Instead, it ruled as a matter of law, issuing an "Order Granting Counterdefendants' Motion for Judgment as a Matter of Law and Dismissing Action with Prejudice." The court specifically stated that "[t]he purpose of the hearing was not to weigh evidence, but rather to determine whether counterclaimants could present sufficient competent evidence to withstand counterdefendants' Motion for Judgment as a Matter of Law." Language throughout the order confirms that it was a ruling as a matter of law. For instance, the court referred to its action as a "dismissal with prejudice," and stated that "the Court finds that the counterdefendants' conduct does not rise to the level of deliberate infringement as a matter of law." Thus, the only interpretation of the district court's action that is consistent with the procedural posture of the case, the title of the court's order, and the court's statement that it was not weighing evidence, is that this was judgment as a matter of law.[8]

Given this posture, our standard of review is a hybrid. *See Bermuda Express, N.V. v. M/V Litsa*, 872 F.2d 554, 557 (3d Cir.1989) (noting that different aspects of laches are governed by different standards of review); *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1039 (Fed.Cir.1992) (en banc) (same). Thus, because the district court ruled as a matter of law, we must construe the facts—as we do in other situations in which the facts have not been adjudicated

---

**8.** The district court's decision to take this approach was likely motivated by a legitimate concern for McClory's constitutional right to a jury trial on the infringement claim; indeed, for this reason, the court may well have been compelled to rule in this manner. *See infra* Section V.

by a trier of fact—in the light most favorable to McClory, drawing all inferences in his favor. *See Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd.*, 40 F.3d 698, 707 (5th Cir.1994) (noting that the standard of review for laches depends on whether the parties were permitted to present evidence); *Murphy v. Timberlane Regional Sch. Dist.*, 22 F.3d 1186, 1189 n. 5 (1st Cir.1994) (same); *cf. Berry v. Bunnell*, 39 F.3d 1056, 1057 (9th Cir.1994) (articulating standard of review for grant of directed verdict); *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180 (9th Cir.1988) (reviewing de novo a grant of summary judgment based on laches). We note, however, that the sheer bulk of McClory's filing belies its admissible substance. Even construing the facts in his favor, we are not bound to accept the inadmissible hearsay and other evidentially-challenged materials.

As for the application of the laches defense itself, we have previously noted a seeming intracircuit conflict regarding the appropriate standard of review. *See Telink, Inc. v. United States*, 24 F.3d 42, 47 & nn.10–11 (9th Cir.1994) (reviewing for abuse of discretion, but noting an intracircuit conflict between the abuse of discretion and clearly erroneous standards). Leaving aside the fact that this conflict may be more apparent than real, *see id.* at 47 n. 11; *Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 940–41 (7th Cir. 1984) (Posner, J., concurring), we need not resolve it here, for we conclude that the district court's ruling on laches must stand regardless whether it is reviewed for abuse of discretion or for clear error.

Finally, the district court's rulings on pure issues of law-such as, for instance, whether there exists a willfulness counterdefense to laches-are reviewed de novo. *See Jackson v. Axton*, 25 F.3d 884, 886 (9th Cir.1994); *Bermuda Express*, 872 F.2d at 557.

**B. DELAY**

■ The first element of laches is delay. Generally speaking, the relevant delay is the period from when the plaintiff knew (or should have known) of the allegedly infringing conduct, until the initiation of the lawsuit in which the defendant seeks to counterpose the laches defense. *Kling v. Hallmark Cards, Inc.*, 225 F.3d 1030, 1036 (9th Cir.2000) ("any delay is to be measured from the time that the plaintiff knew or should have known about the potential claim at issue"); *Jackson*, 25 F.3d at 889 ("Laches is based on the plaintiff's delay in beginning litigation....").

■ For seven of the eight allegedly infringing movies,[9] our calculation is simple, and this element of the laches defense is easily satisfied. From the time that these films were released (between 1962 and 1977, depending on the movie)[10] until McClory filed his counterclaim in this suit (1998), McClory took no legal action to stop, or to seek redress for, the alleged infringements. Thus, for these seven movies, the period of delay ranges from thirty-six years (*Dr. No*) to nineteen years (*The Spy Who Loved Me*). By any metric, this delay is more than enough. *See Jackson*, 25 F.3d at 889 (holding that a delay of at least nineteen years is sufficient); *New*

---

**9.** The seven are *Dr. No, From Russia with Love, Goldfinger, Thunderball, You Only Live Twice, Diamonds Are Forever,* and *The Spy Who Loved Me. The World Is Not Enough* is a special case, which we consider separately below.

**10.** McClory does not argue, nor would it seem reasonable to do so, that he was unaware of these movies. He does argue that he did not know of the extent of the infringement until discovery in this lawsuit, but this argument is backward-he could have gotten that information at any time by bringing suit to challenge the infringements of which he was aware.

*Era Publ'ns Int'l v. Henry Holt & Co.,* 873 F.2d 576, 585 (2d Cir.1989) (holding that two year delay, combined with "severe prejudice," supports laches).

■ McClory would have us calculate delay differently. He argues that various actions on his part should stop the clock on laches. First, he points to his 1961 lawsuit. However, that suit was against Fleming, not against Danjaq.

■ Second, he urges that we stop the clock on delay with the filing of his 1976 lawsuit. Consistent with that argument, although the primary focus of the 1976 suit was the claim by McClory and Connery that *The Spy Who Loved Me* infringed upon their script for *James Bond of the Secret Service,* they did seek to enjoin Danjaq from infringing upon McClory's rights in *Thunderball.* That litigation, however, was brought and dismissed in 1976. To the extent it stopped the clock on laches, it was only momentary, and the clock began running again in 1976, some twenty-two years before McClory brought the instant claims.

■ And, finally, McClory's various telegrams and advertisements do not stop the clock on laches: "Laches is based on the plaintiff's delay in beginning litigation, not on the information a defendant has regarding a claim." *Jackson,* 25 F.3d at 889; *accord Nealey v. Transportacion Maritima Mexicana, S.A.,* 662 F.2d 1275, 1280 n. 6 (9th Cir.1980) ("[T]he delay, which the defense (of laches) contemplates, is not delay in bringing claims to the attention of the defendant. It is ... delay on the part of the plaintiff in instituting litigation on his claims ...." (internal quotation marks and citations omitted; some alterations in original)). Here, complacency in bringing suit apparently won out over McClory's indignancy.

The one set of complications, as noted above, arises from very recent alleged in-fringements—the 1999 movie *The World Is Not Enough* and "any and all infringements included in DVDs and any other new media." We take each in turn.

■ We need not resolve on the merits McClory's contentions regarding *The World Is Not Enough,* because that film is not properly in this lawsuit. It appears nowhere in the counterclaim, which identifies a discrete set of James Bond movies, and at no point did McClory seek to amend the counterclaim to add this movie. It appears for the first time in McClory's opening brief on appeal, and therefore is not properly before us. *See Whittaker Corp. v. Execuair Corp.,* 953 F.2d 510, 515 (9th Cir.1992).

■ Next, we conclude that claims of infringement stemming from re-releases of Bond movies on DVD have been "delayed" for purposes of laches. On the one hand, we recognize the seemingly paradoxical nature of this conclusion. After all, how can it fairly be said that a lawsuit filed in 1998, relating to a DVD released in 1997 (to take the example of *Dr. No* ) was "delayed"? The answer is simple: Where, as here, the allegedly infringing aspect of the DVD is identical to the alleged infringements contained in the underlying movie, then the two should be treated identically for purposes of laches. It would be incongruous indeed to hold the opposite—to say, that is, that McClory's claim for infringement on a re-release survives, despite the dismissal for laches of the same claim regarding the original work. This exception would effectively swallow the rule of laches, and render it a spineless defense. In analogous contexts, similar theories have been roundly rejected. *See, e.g., Hot Wax, Inc. v. Turtle Wax, Inc.,* 191 F.3d 813, 821–22 (7th Cir.1999) (trademark case; rejecting the argument that each new instance of infringement must start the clock anew on laches: "Without the

availability of the application of laches to a claim arising from a continuing wrong, a party could, theoretically, delay filing suit indefinitely."). We decline to reach such a result here.

▮▮▮▮ For similar reasons, we reject McClory's argument that laches may never bar a claim for infringement brought within the statute of limitations. We have already determined that laches may sometimes bar a statutorily timely claim. *Kling*, 225 F.3d at 1039; *Jackson*, 25 F.3d at 888. And, although such an application of laches may be unusual, *see Telink*, 24 F.3d at 45 n. 3, it is appropriate here. Even leaving aside the special circumstance of re-releases, we conclude in any event that McClory's extraordinary delay and the extraordinary prejudice to Danjaq render laches appropriate despite the statute of limitations. *Id.* at 46 n. 5 ("If the defendant can show harm from the delay, the court may, in extraordinary circumstances, defeat the claim based on laches, though the claim is within the analogous limitations period.").

The perfect overlap between the alleged infringements in the DVD re-releases and the original movies requires us to treat them the same for purposes of laches, regardless of the statute of limitations. This is not to say that every re-release must always be treated like the original. After all, when old works are transferred to new media, they often are modified or adorned with new material. Compact discs have "bonus tracks" not contained on the original album; DVDs have "bonus materials" such as alternate audio commentary. These added-on materials may be separately protectable for intellectual property purposes and, in certain circumstances, might be treated differently (for purposes of laches) than the underlying work. But that factual situation is not before us, and we offer no comment on the complicated and controversial world of de-rivative rights, new media, and the like. Here, it has simply been alleged that DVDs "and other new media" contain the same infringing elements as the movies that they reproduce. In this situation, the new medium and the old should be treated as one.

## C. REASONABLENESS OF THE DELAY

▮▮▮▮ The next question is whether McClory's delay was reasonable. *Couveau*, 218 F.3d at 1083. We hold that it was not. In determining reasonableness, courts look to the cause of the delay. Delay has been held permissible, among other reasons, when it is necessitated by the exhaustion of remedies through the administrative process, *see id.* at 1083–84; when it is "used to evaluate and prepare a complicated claim," *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 831 F.Supp. 202, 219 (D.Mass.1993), *rev'd on other grounds*, 49 F.3d 807 (1st Cir.1995), *aff'd*, 516 U.S. 233, 116 S.Ct. 804, 133 L.Ed.2d 610 (1996); and when its purpose is "to determine whether the scope of proposed infringement will justify the cost of litigation," *id.* By contrast, delay is impermissible when its purpose is to capitalize on the value of the alleged infringer's labor, by determining whether the infringing conduct will be profitable. *Haas*, 234 F. at 108.

Here, McClory has presented no sufficient justification for his delay. He claims that by virtue of his earlier lawsuits, there was no delay. This argument fails, for the reasons noted above. He further contends that he did not know of the extent of the infringement until recently. This, too, fails. This is not a case of secret computer code, but of eighteen publicly-released, widely-distributed movies, beginning some forty years ago. *See supra* notes 7, 10. Finally, he has argued at certain points in the litigation that he did not have enough money to bring suit. This consideration

appears generally to be invalid, *Leggett v. Standard Oil Co.*, 149 U.S. 287, 294, 13 S.Ct. 902, 37 L.Ed. 737 (1893); *Gillons v. Shell Co.*, 86 F.2d 600, 606 (9th Cir.1936); *see also Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1554 (Fed.Cir.1996) (citing *Leggett*), and, to the extent it does have force, *cf. Powell v. Zuckert*, 366 F.2d 634, 636–38 & nn.2–4 (D.C.Cir.1966) (discussing the relationship between poverty and laches) is supported by no evidence here.

In short, McClory has offered no viable justification for the delay; thus, this element of laches is also satisfied.

### D. PREJUDICE

Unreasonable delay, however, is not enough: "In addition, laches requires prejudice." *Couveau*, 218 F.3d at 1084. Courts have recognized various sorts of prejudice for purposes of laches. The reason for this is clear and, in some sense, definitional: The very purpose of laches as an equitable doctrine—and the reason that it differs from a statute of limitations—is that the claim is barred because the plaintiff's delay occasioned the defendant's prejudice. *Telink*, 24 F.3d at 45 ("Unlike a limitations period, which bars an action strictly by time lapse, laches bars a claim if unreasonable delay causes prejudice to the defendant. *International Tel. & Tel. Corp. v. General Tel. & Elecs. Corp.*, 518 F.2d 913, 926 (9th Cir.1975). '[L]aches is not like limitation, a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced—an inequity founded upon some change in the condition or relations of the property or parties.' *Holmberg v. Armbrecht*, 327 U.S. [392,] 396, 66 S.Ct. 582, 90 L.Ed. 743 [ (1946) ]." (footnote omitted)).

■ Courts have recognized two chief forms of prejudice in the laches context—evidentiary and expectations-based. Evidentiary prejudice includes such things as lost, stale, or degraded evidence, or witnesses whose memories have faded or who have died. *Jackson*, 25 F.3d at 889–90; *Trs. for Alaska Laborers–Constr. Indus. Health & Sec. Fund v. Ferrell*, 812 F.2d 512, 518 (9th Cir.1987); *Lotus*, 831 F.Supp. at 220. A defendant may also demonstrate prejudice by showing that it took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly. *Jackson*, 25 F.3d at 889 ("Here, Appellees have shown that circumstances have changed in a way that would not have occurred had [Plaintiff] sued earlier."); *Russell v. Price*, 612 F.2d 1123, 1126 (9th Cir.1979) ("Defendants at no time changed their film distribution activities in reliance on [Plaintiff's] conduct."); *Lotus*, 831 F.Supp. at 220 (noting that one form of prejudice is "continuing investments and outlays by the alleged infringer in connection with the operation of its business").

■ Here, the district court properly concluded that Danjaq established both forms of prejudice. It is uncontested that many of the key figures in the creation of the James Bond movies have died in the intervening forty years. These include Ian Fleming; Harry Saltzman and Cubby Broccoli, the producers of the Bond movies; Terence Young, the director of *Dr. No, From Russia with Love*, and *Thunderball*; Richard Maibaum, the screenwriter who wrote seven of the allegedly infringing films, including *Dr. No, Thunderball*, and *The Spy Who Loved Me*; and Richard Whittingham, the screenwriter hired by McClory to work on *Thunderball*.

At the hearing before the district court, Danjaq's president presented unrebutted testimony that many of the relevant records are missing. The Maibaum scripts for *Thunderball* are gone, as are all but the final draft of the *Dr. No* shooting script. Moreover, he testified, Danjaq's

"files are incomplete, and we do not know what all the documents are."

McClory responds only that there are some witnesses (other than the deceased ones) who can testify, and that the case depends primarily on a comparison of the written sources, rather than on live testimony. Neither argument is sufficient to defend the extremely strong claim of evidentiary prejudice to Danjaq. Regarding the availability of witnesses, the inquiry is not whether *some* witnesses might be available-it is whether the absence of *other* witnesses (who will be absent because of McClory's delay) will prejudice Danjaq. *See Jackson*, 25 F.3d at 890 ("That [some witnesses] testified ... does not mean that their memories have not faded or that relevant evidence has not been lost."). It appears quite clear that Danjaq will be hamstrung by the absence of key witnesses. Maibaum wrote the allegedly infringing *Thunderball* shooting script, as well as the allegedly infringing *Dr. No* script. He is clearly the best source for information about the writing of those scripts (as well as the ones that followed), and he would certainly be the best source if Danjaq were to advance a defense of "independent creation" to the infringement claim. Likewise, the producers are integral to the story. That there are a few survivors to tell part of the story does nothing to erase the prejudice caused by the unavailability of most of the key players. Thus, the district court correctly concluded that Danjaq would suffer evidentiary prejudice.

 Having ruled on evidentiary prejudice, the district court declined to consider what it termed "economic prejudice," although it did note that "the economic prejudice in this case would be sufficient, standing alone, to support a claim of laches." We agree that the record supports Danjaq's claim of economic prejudice, and that this prejudice is also sufficient to support the second element of laches. Danjaq presented uncontested evidence that it invested approximately "one billion dollars," *cf. Austin Powers* (New Line Cinema 1997), in the "development, production, marketing, [and] distribution" of the James Bond movies. Given this fact, it would be inequitable to permit McClory to wait forty years, then to profit from the risk inherent in Danjaq's investment in the franchise. *Kling*, 225 F.3d at 1039; *Haas*, 234 F. at 108.

Thus, the district court was correct to conclude that Danjaq established the prejudice element of laches and each of the other elements of the laches defense.

## II. AN EXCEPTION TO LACHES: WILLFUL INFRINGEMENT OR DELIBERATE PIRACY

McClory next argues that, even if time is not on his side, the equitable defense of laches is nonetheless inapplicable because Danjaq willfully infringed upon his intellectual property rights. Before we examine McClory's case on the merits, a background word about the "willful infringement" counterdefense (a.k.a. "deliberate infringement," "naked infringement," or "deliberate piracy") may be useful.

Over the past eighty-five years, various courts have held that laches does not bar a suit against a deliberate infringer. This principle appears to be based on the equitable maxim that "he who comes into equity must come with clean hands," *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir.2000) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945)), and entered the legal landscape in the form of a musing by Judge Learned Hand, as a caveat to his famous articulation of the laches doctrine, quoted earlier, *see supra* p. 950:

It must be obvious to every one familiar with equitable principles that it is inequitable for the owner of a copyright, with full notice of an intended infringement, to stand inactive while the proposed infringer spends large sums of money in its exploitation, and to intervene only when his speculation has proved a success. Delay under such circumstances allows the owner to speculate without risk with the other's money; he cannot possibly lose, and he may win. *If the defendant be a deliberate pirate, this consideration might be irrelevant,* and I think it such as to [defendant] Piantadosi; but it is no answer to such inequitable conduct, if the defendant Feist is innocent, to say that its innocence alone will not protect it.

*Haas,* 234 F. at 108 (emphasis added).

Several courts have applied this "piracy" exception to laches, chiefly the Second Circuit, *see, e.g., Hermes,* 219 F.3d at 107; *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.,* 166 F.3d 65, 75 (2d Cir. 1999), and the Northern District of Illinois, *see, e.g., Harmony Gold U.S.A., Inc. v. FASA Corp.,* 40 U.S.P.Q.2d 1057, 1060 (N.D.Ill.1996); *Am. Airlines, Inc. v. A 1–800–A–M–E–R–I–C–A–N Corp.,* 622 F.Supp. 673, 685 (N.D.Ill.1985), and it has been recognized in the various copyright treatises, *see* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.06, at 12–125 (Dec.2000) ("Moreover, delay in pursuing a claim may not be a bar against one who knew of plaintiff's asserted rights, or as against a deliberate infringer." (footnotes omitted)); 2 Paul Goldstein, *Copyright* § 9.5.1, at 9:30 to :31 & nn.17–18 (2d ed. Supp.2000); 1 Neil Boorstyn, *Boorstyn on Copyright* § 12.08, at 12–42 & n.4 (Dvora Parker ed., 2d ed.2000).

▉ Although we have not had occasion to apply this willfulness exception in the recent past, we have previously recognized it, and it remains the law of this circuit. (Notably, Danjaq does not contend otherwise.) In *Universal Pictures Co. v. Harold Lloyd Corp.,* we adopted Judge Hand's reasoning in *Haas,* repeating the language noted above: " 'If the defendant be a deliberate pirate this consideration (laches) might be irrelevant, and I think it such * * *.' " 162 F.2d 354, 372 (9th Cir.1947) (quoting *Haas,* 234 F. at 108). We then went on to cite a Third Circuit case for the same proposition. *Id.* (" 'Mere delay will not ordinarily bar a suit for an injunction against a naked infringer.' " (quoting *Window Glass Mach. Co. v. Pittsburgh Plate Glass Co.,* 284 F. 645, 650 (3d Cir.1922))). And in a slightly more recent case, we have applied this principle in the trademark arena. *Nat'l Lead Co. v. Wolfe,* 223 F.2d 195, 202 (9th Cir.1955) ("The attempted proof of laches is too trivial to require serious consideration. In the light of the intentional and fraudulent use of appellant's trade mark, the defense here is a frivolous one. *Menendez v. Holt,* 128 U.S. 514, 523, 9 S.Ct. 143, 32 L.Ed. 526 (1888).").

Though we have previously applied this willfulness exception, we have not, enunciated a legal standard that governs its application. Rather than imposing wholesale a new set of standards upon this already complex area of law, we accept the parties' invitation to adopt the definition of "willful infringement" that is used elsewhere in the Copyright Act. *See* 17 U.S.C. § 504(c)(2) (providing for enhanced statutory damages where the "infringement was committed willfully"). Thus, for purposes of the willfulness exception to laches, just as for the willfulness augmentation of statutory copyright damages, the term "willful" refers to conduct that occurs "with knowledge that the defendant's conduct constitutes copyright infringement." *Columbia Pictures Television v. Krypton Broad.,* 106 F.3d 284, 293 (9th Cir.1997) (internal quotation

marks and citation omitted), *rev'd on other grounds sub nom. Feltner v. Columbia Pictures Television,* 523 U.S. 340, 118 S.Ct. 1279, 140 L.Ed.2d 438 (1998); *see also* 4 Nimmer, *supra,* § 14.04[B][3], at 14–53 (Dec.2000) (defining willful infringement).

■ Here, we affirm the district court's determination as a matter of law that McClory cannot demonstrate deliberate infringement. Despite the searching level of scrutiny occasioned by the standard of review, we are nonetheless satisfied that the evidence is insufficient as a matter of law to demonstrate that Danjaq willfully infringed on McClory's rights.

The record before us tells the following story. In the early 1960s, McClory and Fleming were embroiled in a dispute over the rights to the *Thunderball* novel and script materials. Danjaq was aware of this dispute and took care not to infringe upon McClory's rights. In the course of purchasing the film rights to Fleming's books, *Thunderball* was expressly excluded from the deal pending the outcome of the litigation between Fleming and McClory. And when the litigation dragged on too long, Danjaq shelved its efforts to make *Thunderball* and instead went forward with *Dr. No.*

Then, despite McClory's just-concluded struggles with Fleming over the rights to *Thunderball,* he did not file suit against Danjaq for any purported infringements in *Dr. No* or *From Russia with Love,* nor did he complain about them. Indeed, not only did he fail to sue Danjaq—he went into business with them. In 1965, McClory and Danjaq negotiated a ten-year license, pursuant to which Danjaq released *Thunderball.* This fact, too, suggests an absence of bad faith on Danjaq's part, and it further suggests that Danjaq had no notice during that period of any copyright claims by McClory vis-a-vis Danjaq properties. And when McClory sued in 1976, alleging, among other things, that the soon-to-be-released movie *The Spy Who Loved Me* infringed upon his rights in *Thunderball,* Danjaq responded by removing the allegedly infringing material. The suit settled and although Danjaq had released nine other Bond films by that time, McClory never pursued a claim that Danjaq had pirated the Bond character. Even McClory's telegrams and ads merely rehashed past events, *see supra* page 949, and did not assert that McClory owned the entire cinematic James Bond character.

This is not to say that Danjaq's conduct—as alleged by McClory, of course—was beyond reproach. According to McClory, certain elements that were first developed in McClory's materials made their way into Maibaum's script for *Dr. No.* In particular, McClory claims that he originated the "cinematic James Bond character," one who was witty and dashing, rather than brooding and alcoholic, as he describes the literary James Bond.

But even assuming this allegation to be true, McClory could show at most only infringement, not *willful* infringement. He has put forward no direct evidence of willful infringement, nor does the circumstantial evidence support this claim. Indeed, Danjaq was not on notice before the current litigation that McClory claimed a right in the supposed cinematic iteration of the James Bond character. The Bond character had been developed by Fleming over the course of six years and seven books before McClory came into the picture. Even assuming that McClory reinvented the Bond character in the *Thunderball* script materials, there was simply no way for Danjaq to know that McClory was laying claim to such a property. Given that lack of notice, and the absence of evidence of willfulness, a jury could not find willful infringement.

The complexity of the chain of title to the various elements of the Bond stories further precludes a jury finding of willful infringement. Both *Dr. No* and *Thunderball* were produced under color of title, an arrangement that defeats the willfulness claim in this circumstance. *See Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1334 (9th Cir.1990) (approving the district court's refusal to find willfulness where the defendant was acting under color of rights granted by a license); *see also Frank Music Corp. v. MGM, Inc.*, 772 F.2d 505, 515 (9th Cir.1985) (holding that, where defendants reasonably could have believed that they had a valid license to use plaintiffs' works, it was not clearly erroneous for the district court to find no willful infringement); 4 Nimmer, *supra*, § 14.04[B][3], at 14–54 to –54.1 (Dec.2000) ("It would seem to follow that one who has been notified that his conduct constitutes copyright infringement, but who reasonably and in good faith believes the contrary, is not 'willful' for these purposes." (footnotes omitted)). And, as we have already noted, Danjaq was not on notice as to the scope of rights now claimed by McClory; nor is there any evidence that Danjaq took a "damn the torpedoes" approach and decided to gamble as to the ultimate determination of rights. Therefore, as a matter of law, Danjaq's conduct was not willful.

■ For these same reasons, we cannot adopt a rule, as McClory urges, that Danjaq must be inferred to have acted willfully merely because McClory had laid claim to certain rights. Our case law forecloses such a result, *see Frank*, 772 F.2d at 515; *see also Peer Int'l Corp.*, 909 F.2d at 1335–36 ("To refute evidence of willful infringement, [the defendant] must ... establish its good faith belief in the innocence of its conduct ... [and] that it was reasonable in holding such a belief."), and with good reason. Intellectual property rights are often disputed. *See Kling*, 225

F.3d at 1037. To hold that willfulness must be inferred whenever an alleged infringer uses an intellectual property in the face of disputed title would turn every copyright claim into willful infringement and would improperly discourage many legitimate, good faith transactions.

Thus, even drawing all inferences in McClory's favor, we must affirm the district court's conclusion that McClory is unable as a matter of law to demonstrate deliberate infringement.

## III. SCOPE OF THE LACHES RULING

■ McClory contends in the alternative that laches does not bar all of his claims, thereby challenging the district court's holding that laches barred "all of counterclaimants' claims based on the rights at issue." In particular, McClory argues that, even if laches applies, it does not bar a prospective injunction against future infringement. This principle, although generally sound, does not apply where, as here, the feared future infringements are subject to the same prejudice that bars retrospective relief.

McClory is correct that laches typically does not bar prospective injunctive relief. However, the rule is not, as McClory would have it, an absolute one. Indeed, we have already disposed of this argument in the trademark context, interpreting and distinguishing the very line of cases upon which McClory's argument rests. *See Prudential Ins. Co. v. Gibraltar Fin. Corp.*, 694 F.2d 1150, 1152 & n. 1 (9th Cir.1982). Rather, the general rule that laches does not bar future injunctive relief stems from a practical recognition of the interaction between the temporal components of those two doctrines. Laches stems from prejudice to the defendant occasioned by the plaintiff's past delay, but almost by definition, the plaintiff's past dilatoriness is unrelated to a defendant's

ongoing behavior that threatens future harm. *Lyons P'ship, L.P. v. Morris Costumes, Inc.,* 243 F.3d 789, 799 (4th Cir. 2001) ("A prospective injunction is entered only on the basis of current, ongoing conduct that threatens future harm. Inherently, such conduct cannot be so remote in time as to justify the application of the doctrine of laches.").

Thus, in *Hampton v. Paramount Pictures Corp.,* we held that injunctive relief was not barred in that case because the injunction arose out of a timely complaint regarding recent infringements. 279 F.2d 100, 105 (9th Cir.1960). That is, we concluded that the plaintiff's delay in bringing suit-and hence, the defense of laches-did not infect the particular complaint of infringement that had led the district court to award injunctive relief. *Id.; see also* 3 Nimmer, *supra,* § 12.06, at 12–126 (2000) ("[E]ven if laches constitutes a bar to an action for past infringements of the same work, if the plaintiff acted without undue delay with respect to the particular infringement in issue, the defense of laches may not be raised as to such infringement." (citing *Hampton* )).

■ But the situation is very different when, as here, the feared future infringements are identical to the alleged past infringements. Sequels and re-releases present this issue most starkly. McClory contends that each of the objectionable James Bond movies-past, present, and future-infringes upon his rights in the same way, stemming from the same claimed original sin: Maibaum's alleged access to the *Thunderball* script materials. In a situation like this one, laches may bar prospective injunctive relief. After all, we already know that McClory's prospective claims will suffer from the very same evidentiary defects that bar his older claims.

For instance, if *The World Is Not Enough* (or the Bond movie reportedly slated for release in 2002) is claimed to infringe on McClory's rights in the same fashion that *Dr. No* is alleged to have done, then Danjaq would face the same evidentiary prejudice in defending those later movies that it would face in defending *Dr. No.* Thus, the district court was correct to hold that laches may-and did-properly bar the remaining claims. We hasten to note, however, that this bar to suit has little to say about the laches defense generally; rather, it is a special case that arises only when we know in advance that the defendant will be substantially prejudiced in its ability to defend future claimed infringements in just the same way that it was prejudiced with regard to prior alleged infringements.

## IV. DENIAL OF TRIAL CONTINUANCE

■ McClory next contends that the district court erred when it failed to grant his motion to continue the bench trial. In reviewing this claim, we discover that delay figures into more of this case than just laches. The proceedings were first delayed in 1999 so that McClory could find new counsel in order to keep his counterclaim alive. Then, four days before the trial was to start, McClory moved for a continuance so that he could travel to England to oversee funeral arrangements for his sister-in-law.[11] The court denied that motion on the belief that McClory could attend the funeral and travel to Los Angeles in time for the trial. McClory failed to appear for the first day of trial. He did, however, send a letter stating that he could appear and testify two days later. But McClory neither appeared nor informed the court (or his own attorney) of his whereabouts. (Eventually, McClory

---

11. McClory also sought to continue the hearing on this appeal. We accommodated him by permitting him to argue pro se via teleconference from Ireland. He was, at that time, also ably represented by counsel who appeared before the court.

sent word that he had had visa problems and had been unable to reenter the United States.) Thus, presumably to protect McClory's rights, before proceeding further the court asked McClory's counsel what McClory could contribute at trial. McClory's own attorney acknowledged that McClory "would [not] contribute much more to what is in the record." With that colloquy, the district court determined that evidence was closed because of the prejudice to Danjaq and to the court caused by McClory's misconduct; stated that it would consider McClory's lengthy declaration (a generous ruling, we note, as the declaration is full of hearsay and unauthenticated documents); and ruled in favor of Danjaq. Nevertheless, McClory's counsel did not ask for another continuance or seek to reopen the evidence. McClory now contends that the district court erred when it failed to grant his motion for a continuance.

■ A district court's decision regarding a continuance is given great deference, "and will not be disturbed on appeal absent clear abuse of [the court's] discretion." *United States v. Flynt,* 756 F.2d 1352, 1358 (9th Cir.), *amended,* 764 F.2d 675 (9th Cir.1985). To meet this burden, the challenging party must meet a four-part test, the fourth (and mandatory) element of which requires a demonstration of prejudice. *Flynt,* 756 F.2d at 1359; *United States v. 2.61 Acres of Land,* 791 F.2d 666, 671 (9th Cir.1985) ("Absent a showing of prejudice suffered by the appellant . . . this Court will not disturb the ruling below."). Here, McClory fails to meet this fourth prong. His own attorney admitted that he would add nothing to Danjaq's testimony. Moreover, McClory did not request a reopening of the record or a continuance after the presentation of testimony, and on appeal failed to identify any prejudice caused by the district court's decision. In addition, two of the other three factors weigh against McClory. *See*

*Flynt,* 756 F.2d at 1359 (listing factors). Thus, the district court appropriately considered McClory's lack of diligence in advising the court of his circumstances (the first factor) and the inconvenience to the court and the opposing party occasioned by McClory's repeated delays (the third factor). The court's decision not to continue the trial was not, therefore, an abuse of discretion.

**V. BIFURCATION OF THE TRIAL**

■ Finally, McClory challenges the district court's decision to bifurcate laches from infringement. Although the district court had previously denied a motion to bifurcate the trial, when the parties arrived for trial, the court announced that it was bifurcating laches from liability. McClory now contends that the court abused its discretion when it did so, arguing that the issue of willful infringement is intertwined with the issue of infringement, and that bifurcation was therefore unnecessary. We affirm the district court here, but with the caution that the bifurcation of laches from infringement may sometimes run afoul of the Seventh Amendment.

■ "The trial court's decision to bifurcate a trial is reviewed for an abuse of discretion." *Exxon Co. v. Sofec, Inc.,* 54 F.3d 570, 575 (9th Cir.1995), *aff'd,* 517 U.S. 830, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996). One favored purpose of bifurcation is to accomplish just what the district court sought to do here-avoiding a difficult question by first dealing with an easier, dispositive issue. *Hirst v. Gertzen,* 676 F.2d 1252, 1261 (9th Cir.1982). But while the district court has broad authority to "order a separate trial of any claim" in the interest of "convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy," Fed. R.Civ.P. 42(b), this discretion is limited by constitutional constraints. As the text of

the rule itself notes, this discretion must be exercised so as to "always preserv[e] inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States." *Id.*

Pertinent for our purposes, such a constitutional concern may arise when the district court orders that some portions of a case be tried to the judge and others to a jury. Generally speaking, this arrangement is permissible, because only certain issues carry the right to a jury trial. In particular, "[t]he [S]eventh [A]mendment preserves the right to trial by jury of all legal claims," whereas "no right to a jury exists" for equitable claims. *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.,* 890 F.2d 165, 170 (9th Cir.1989). This is exactly the situation that presents itself here. McClory has a constitutional right to a jury trial on his copyright infringement claims, *see Feltner,* 523 U.S. at 355, 118 S.Ct. 1279; 3 Nimmer, *supra,* § 12.10[A], at 12–145 (May 2000), but there is no right to a jury on the equitable defense of laches, *see Granite State Ins. Co. v. Smart Modular Techs., Inc.,* 76 F.3d 1023, 1027 (9th Cir.1996) ("A litigant is not entitled to have a jury resolve a disputed affirmative defense if the defense is equitable in nature.").

Thus, bifurcation causes no constitutional problems, so long as the legal and equitable issues are distinct: "If the legal and equitable claims do not involve common issues, the district court has discretion to regulate the order of the trial." *Id.* Difficulties may arise, however, when the legal and equitable issues overlap and the evidence is intertwined. When that occurs, the district court must take care not to impinge on the right to a jury:

> [W]here equitable and legal claims are joined in the same action, there is a right to jury trial on the legal claims which must not be infringed either by

trying the legal issues as incidental to the equitable ones or by a court trial of a common issue existing between the claims.

*Ross v. Bernhard,* 396 U.S. 531, 537–38, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970). "Thus, where there are issues common to both the equitable and legal claims, 'the legal claims involved in the action must be determined prior to any final court determination of [the] equitable claims.'" *Dollar Sys.,* 890 F.2d at 170 (quoting *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 479, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) (alteration in original)).

Just this sort of overlap could have presented itself here. The equitable defense of laches is subject to a counterdefense of naked infringement, which is just one short step removed from the issue of infringement. Indeed, in most cases, it is likely that these closely related issues would become intertwined at trial, as infringement is a predicate to finding willful infringement, and infringement often presents a question of fact for the jury. Thus, when naked infringement is posed as an exception to laches, the bifurcation of laches from infringement may cause constitutional problems.

Here, however, there was no such problem. Rather, the district court appears to have been quite cognizant of McClory's constitutional rights. It stated: "In conducting the laches hearing, the Court has been extremely sensitive of counterclaimants' right to a jury trial on the issue of infringement. The purpose of the hearing was not to weigh evidence...." To that end, the court did not rule on the issue of infringement. Instead, it essentially assumed infringement (as we do on appeal) and addressed willfulness as a matter of law. Because the court ruled as a matter of law, it did not tread on McClory's right to a jury trial on infringement. Thus, McClory suffered no prejudice and the

district court did not abuse its discretion in opting to bifurcate the laches claim.

### CLOSING CREDITS

So like our hero James Bond, exhausted after a long adventure, we reach the end of our story. For the foregoing reasons, we affirm the district court's determination that Danjaq established laches; that, as a matter of law, McClory is unable to establish willful infringement; and that laches bars McClory's claims in their entirety. We also conclude that the district court did not abuse its discretion by bifurcating the trial and by declining to grant a continuance.

AFFIRMED.